### E. B. HAMILTON v. STATE.

No. 1815.   Decided January 15, 1913.

Rehearing Denied February 12, 1913.

**1.—Incest—Intimidation of Witness.**

Where, upon trial of incest, the evidence showed that the testimony of the female against the defendant in the case was procured by threats, intimidations, and confinement in jail, the conviction could not be sustained.

**2.—Same—Attorney and Client.**

Where, upon trial of incest, the record on appeal showed that the officers refused the attorney for the defendant and his codefendant to take counsel with the latter in the preparation of defendant's defense, and forced said codefendant to testify against defendant, the same was reversible error.

**3.—Same—Rights of Counsel—Practice—Fair Trial.**

Where defendant and the female with whom it was charged he had incestuous intercourse employed an attorney to defend them, and said female was induced to turn State's evidence after she had been confined in jail and threatened with imprisonment in the penitentiary if she did not testify for the State, and was prevented from consulting with her counsel, and said counsel was not permitted to investigate the testimony which she had given before the grand jury, and prevented from interrogating her as to this, the same was reversible error.

**4.—Same—Custody of Prisoner—Right of Consulting Counsel—Constitutional Law.**

Under the Constitution of Texas, every person accused of crime has the right to consult counsel, and under Article 1046, Revised Penal Code, it is an offense if an officer or any other person having the custody of a prisoner wilfully prevents such prisoner from consulting or communicating with counsel.

**5.—Same—Charge of Court—Undivorced Wife.**

Where, upon trial of incest by defendant upon his stepdaughter, the defendant introduced evidence that he had a living undivorced wife at the time he married the mother of his codefendant, the failure of the court to submit a requested charge that the jury must find from the evidence that the former wife was dead or legally divorced before they could convict defendant, was reversible error. Following McGrew v. State, 13 Texas Crim. App., 340, Harville v. State, 54 Texas Crim. Rep., 426, and other cases.

**6.—Same—Fair and Impartial Trial.**

Where, upon appeal from a conviction of incest, the record showed that the defendant did not have a fair and impartial trial, and a witness against him was coerced to give testimony against him by the conduct of the grand jury and the deputy sheriff and others, the cause must be reversed and remanded for new trial.

Appeal from the District Court of Hunt. Tried below before the Hon. R. L. Porter.

Appeal from a conviction of incest; penalty, two years and one-half imprisonment in the penitentiary.

The opinion states the case.

*J. G. Mathews* and *Neyland & Neyland,* for appellant.—On question of former undivorced wife: Stanford v. State, 60 S. W. Rep., 253.

On question of treatment of witness to testify against defendant: McMahan v. State, 61 Tex. Crim. Rep., 489; 135 S. W. Rep., 558; Simmons v. State, 55 Tex. Crim. Rep., 441; 117 S. W. Rep., 141; Moore v. State, 26 S. W. Rep., 403; Humphrey v. State, 143 S. W. Rep., 641; 65 Tex. Crim. Rep., 111.

*C. E. Lane,* Assistant Attorney-General, and *C. A. Sweeten,* for the State.

DAVIDSON, Presiding Judge.—Appellant and Annie Wood were charged with incest and appellant given two years and a half in the penitentiary.

The case is peculiar in several respects. Appellant was about 63 or 64 years of age, living in the country about four miles from the City of Greenville in Hunt County. He employed the mother of Annie Wood as a sort of housekeeper and she and Annie Wood and a son and another daughter, a married woman, or widow, took up their abode at the residence of appellant. After the mother of Annie Wood had been at the place a while she stated to appellant one day that living in the house with him and occupying it as she and her children were, might cause comment and it would be better that they should marry. After talking over the matter an amicable arrangement was

reached and they went to town and were married. They went that
night to a hotel in Greenville and about 11 o'clock retired to their
room. Appellant's newly married wife commented on the fact that
there was but one bed in the room. He suggested in reply that it was
not necessary that there be two beds for a man and his wife, that one
was sufficient. She then informed him she had a statement to make
to him, which she proceeded to do, in regard to her physical condi-
tion, and to sustain her statement exhibited her person so as to
discover to appellant the fact that she was badly diseased,—from her
waist practically down to her feet being covered with sores. This
outraged appellant very much and, therefore, they did not assume
the relation of husband and wife, so far as having intercourse was
concerned. He sent her away to Corpus Christi for the purpose of
curing her if it could be accomplished. Annie Wood remained in
the house after her mother had gone, as housekeeper, and it was dur-
ing this time or period that the incestuous intercourse is alleged to
have occurred. Appellant and Annie Wood were arrested on the
charge of adultery and later the accusation was changed to incest.
They employed J. G. Matthews, Esquire, an attorney of the Green-
ville bar to defend them and also to bring civil suits for damages
against parties interested in the prosecution. They were incarcerated
in jail, bond was fixed at $1,500 in the incest case, and Mr. Matthews
prepared a bond for each in that amount. Appellant readily gave
bond. Mr. Matthews secured signatures for bond of Annie Wood
and carried it to the jail where she was in custody with a view of
having her sign it. The officer refused to let Mr. Matthews see his
client, but as Mr. Matthews says, "kindly" agreed to take the bond
and have Annie sign it. She signed it. The officer declined, however,
to turn her out after giving the bond, on the ground that the grand
jury was going to indict her in another case. It seems, they had not
at that time done so. The evidence indicates that in fact they did
subsequently indict her in another case of incest with the defendant.
Mr. Matthews undertook to see Annie Wood and confer with her, but
the officer declined to let him see or talk with her. Mr. Matthews
then filed a motion to compel the sheriff to allow him access to his
client, Annie Wood, setting out the fact,—first, that Annie Wood had
been charged by some character of affidavit, filed about the 13th of
October, 1911, and bond furnished her by the sheriff for her to sign,
and that on the 13th day of October, 1911, her said attorney, J. G.
Matthews, went to the jail to get her signature to said bond, but the
jailer refused him admittance, stating that he had orders from the
grand jury not to allow anyone to talk to her; that he was refused
admittance to the place where she was confined; that about ten or
twelve days ago the grand jury presented an indictment charging
her with incest, and on the 18th or 19th of the same month Mr. Mat-
thews carried her bond to the jail to get her signature, "and the
sheriff or jailer in charge again 'kindly' consented to go and get

the signature of said Annie Wood to said bond, but refused to allow her said attorney (Matthews) to see her, but that said attorney without antagonizing the said sheriff's force or the jailer took the bond, and obtained signatures of two good and solvent sureties, and presented the same to the sheriff, and the said sheriff held said bond for a considerable length of time, but refused to liberate the defendant, and waited patiently for the grand jury to present another bill in a different case, and then approved and filed the bond among the papers of the case, said bond being fixed by the court at fifteen hundred dollars; that the bonds fixed by this court against the said Annie Wood charged with the offense of incest in the two cases amount to the sum of three thousand dollars, which she will not be able to make, and the only way that this attorney can do to have the assistance of the said Annie Wood, defendant, in shaping up her defense is for him to have access to his client on the inside of the jail or have her brought to some place of safety where she can have the privilege of consulting with her attorney in shaping up process, and preparing her defense.'' This motion wound up with a prayer that the sheriff be directed to bring his client to his office, or some other office with directions to the sheriff that she be permitted to have a private talk with her attorney without the hearing of anyone except herself and her attorney. This motion was presented to the Honorable T. D. Montrose, who was presiding over the court in the absence of the regular Judge Honorable R. L. Porter, and that said District Judge. Montrose, still presiding, on the 24th of October, 1911, had Annie Wood brought into open court, the said Annie Wood not being brought until after the motion had been read. The court then placed the said Annie Wood on the witness stand and stated to her attorney that he might proceed, and the said Annie Wood being interrogated stated that she did not have an attorney; that she would like to have one, and that she had asked the jailer to go and see J. G. Matthews as he had been representing her before she was put in jail, and that if he was not going to represent her that for him to see B. Q. Evans, but that she never received any report from the message; and the district attorney then asked her if she had testified before the grand jury under an agreement that she would not be prosecuted, and the defendant stated that she had told the truth, and the district attorney then stated that they were not going to prosecute defendant but was holding her as a witness; and counsel for E. B. Hamilton, then asked the court that if she was a witness against his client, her co-defendant, that he be permitted to have a private talk in order to shape up the defense of his client, and this the court refused, stating that he might as well turn her over to Mr. Hamilton (this defendant), and said attorney then and there objected, etc. This bill is signed by the judge.

Another bill in this connection shows that Annie Wood was brought into court by the sheriff on Wednesday evening after the witness

had been sent back to jail on Monday, and also Tuesday, and the jury held from the time they were empaneled Monday morning until Wednesday afternoon, waiting for the witness to testify as to whether or not the defendant had had intercourse with her. The defendant obejcted to the testimony of said witness upon the following grounds: First, that she stands charged by indictment with the same offense as the co-defendant with this defendant on trial; second, because said witness has twice previous to this been put on the stand at the instance of the State and failed to testify as to the matters sought to be proved by her as a witness for the State, and remanded to the custody of the sheriff and compelled to remain in the sheriff's custody under the order of the court, since the beginning of this case; third, that the conduct of the court in remanding said witness to the sheriff and keeping the jury in the hands of the constable and officers is of such a character as is likely to intimidate the witness and cause her to give testimony against herself and against the defendant. The court overruled the objection, defendant excepted and the witness then proceeded to answer in response to the questions, the questions and answers being here given: "Q. At the time that you and your stepfather lived together there, out there (Mr. Hamilton), did he have carnal intercourse with you? A. Witness nodded her head, signifying, 'Yes.' Q. You answer that he did? A. Yes, sir. Q. When was the last time that he had intercourse with you? A. About the 10th of September. Q. This last September? A. Yes, sir. I lived at Mr. Hamilton's about three months. Q. You said he had intercourse with you—carnal knowledge of you—Q. Do you know what intercourse means? A. Witness shook her head signifying, 'No.' Q. Did he deal with you like he would, he would if he had been your husband? A. I done just as he would if a wife or unmarried people. Q. Did he ever get on top of you? A. Witness shook her head, signifying, 'No.' Q. Never did—did he ever get between your legs? A. That is the way they got it down. Q. You say that is the way they have got it down, but I want to know the truth? A. He done it sideways. He stuck his privates in mine only twice. I have been in jail there for the last three weeks, by myself most of the time. I have never talked with anybody about this case, and was never allowed to talk with anybody about it. Q. Did you ever try to get anybody to go and get you a lawyer? A. Yes, sir. Witness proceeds: I have been confined there about twenty-five or twenty-six days. I was out there at home when Mr. Hamilton had intercourse with me; nobody was present. I have been told what would become of me if I did not testify to that fact—that I would be sent to jail and the penitentiary. Q. Is that the reason you are swearing it? Witness nodded her head. I have been out here twice to swear that fact, and have refused both times, and they have sent me back both times to jail, and now I say they told me they would send me to jail and the penitentiary if I did not swear it, and that is the reason I am swearing it; I have been

·out of the jail two or three hours, the new man, the jailer, has had charge of me; I don't remember who he is; he had had me strictly under his guard. I have not been permitted to talk to Mr. Hamilton's lawyer or any other lawyer. Q. Has J. G. Matthews been your lawyer; and was he your lawyer when you were put in jail? Mr. Sweeton: We object, your honor. Judge Porter: Sustain the objection. Judge Matthews: We except. Witness: I have persistently refused to testify to that fact clear up until now, and they told me they would put me in jail and send me to the penitentiary, if I did not do it. A grand juror told me that. They had me there this morning in this case. They did not tell me what·anybody else had sworn. Q. Did they tell you that Dr. Smith claimed that you had been entered by somebody else? A. Yes, sir. Q. The grand jury represented that fact to you? Witness proceeds: I have been before the grand jury before on this case, and they sent out and got me again on this same case, and claimed to me that they would send me to the penitentiary and put me in jail, if I did not tell this thing about Mr. Hamilton. They told me to come up and sign something. I don't remember what I signed; they read it over to me, but I did not read it. I don't remember everything they read. I have been told by a juryman that if I did not stick to that written statement I would be sent to the penitentiary. I don't remember seeing that written statement today when I was in the grand jury room; I don't remember it; they told me that if I did not stick to that written statement I would be sent to the penitentiary. Q. That is the reason you are testifying that way now? A. Witness nodded her head, signifying, 'Yes.' Q. You stated yesterday when you went out that you would not send an innocent man to jail or the penitentiary; that you would go back there and stay first; what has caused you to change your mind on that? A. Because they threatened to send me. I am 33 years old. I first saw Mr. Hamilton the 14th day of May; that was about two weeks after he married my mother. At the time he married my mother, I was living at the lake in Paris. I came here to Mr. Hamilton's because my mother and my brother sent for me to come. I had never seen Mr. Hamilton until the 14th of May. I lived there then with my mother and brother and Mr. Hamilton. I do not know how my mother came to leave me there. I knew she was leaving Mr. Hamilton when she went off to stay and never come back. She told me to stay there. I knew where she was going at the time; she was going to Corpus Christi, because her health was bad; at the time my mother married Mr. Hamilton and at the time she went to Corpus Christi she had nervous trouble and her feet were sore from her knees down —almost solid sores from her knees down. Q. Miss Annie, since you have been in jail, how have you been fed? Court sustains some objections. Q. What was the treatment brought to bear on you last night in jail? Did anyone talk to you to have you change your testimony? A. Two of them came down to the jail one night this week—two of

the jurymen. They tried to get me to go ahead and plead guilty—tell it all; they were two of the same men I have been seeing in yonder (referring to the grand jury room); they said they would try me; they promised me they would turn me loose, if I would make this change. I am swearing for my liberty now; swearing to get out of jail; that is the object; nobody, except those two grand jurors, has been there to the jail and talked with me on the inside about my case that has been this week. Q. Has there been any torture applied? Anything of that sort, only you just fastened up in the jail. A. Yes, sir. Q. What was done, Miss Annie? A. Changed me over on the other side last night. They put me over on the north side of the death cell; it was in the death cell they put me; it was not very dark in there; I could see the trap door just in the hall-way; they put me in the death cell to keep me from talking to anybody, I suppose. A juryman told me it was the death cell, but he was not there when I was changed; they came after I was changed; I had done went to bed; they called me up and I went down stairs; they did not see me in that room; they called for me and I was taken down stairs to talk to two of the jurymen; they gave me to understand that if I did not testify this against Mr. Hamilton, I would be put back in jail and sent to the penitentiary; I was required to testify on that account—the reason I am doing it today. Last night I would make the change in my testimony; that grand jury brought me back all the same; they put me back in the death cell; the traps is right out in the hall-stairway. I know what it was, because one of the prisoners told me; that was not the first night that I was ever put in the death cell. I was put in there when I first came, but they had changed me back to a better place, but last night they put me back right at the same old place, and gave me to understand that, unless I gave this testimony against Mr. Hamilton, I would be sent to the penitentiary.'' And the court having overruled the objections made by the defendant's counsel, as above stated, and the witness having given the above testimony, the defendant at the time, excepted to the action of the court, etc. Judge Porter qualifies this with the following explanation: ''This witness, Annie Wood, first testified in regard to defendant's illicit connection with her before the grand jury, after having been promised immunity from prosecution herself. From the time she was before the grand jury until the date of trial she was held in jail on a charge of incest. However, the State agreed with her to use her as a witness in the Hamilton case and to dismiss her cases. While she was in jail and before the trial the defendant wrote her notes in which he advised her 'to stand firm and tell nothing.' The evidence further showed that on Sunday night before the trial on Monday the defendant secured lodging near the jail and hollered to this witness on that occasion and advised her to 'stand firm.' Knowing these facts, when the witness refused to testify, I privately ordered the sheriff to hold the witness in jail until she in-

dicated a willingness to testify. When she did testify and the trial was over, she was released from jail.''

Another bill recites these matters again and another motion made by J. G. Matthews, reiterating these matters at some length and more explicitly in which he sets up the relation of attorney and client and the refusal of the court to permit him to talk with her, either as his client or as a witness in the case, and reiterates also the fact that she had been placed in jail, and all of the previously mentioned threats are again gone over. This bill also recites, and the record shows conclusively, both by testimony and by bill of exception, in addition to what has been stated, that the trial began Monday morning; that Annie Wood was brought out and refused to testify in the case; that she was sent to jail and put in charge of an officer and the court went on with other business; that Tuesday morning she was again brought out and again refused to testify against the defendant. She was again put back in jail and sometime during Wednesday she was again brought out and testified, giving as a reason for testifying at the time that she had been visited in jail on more than one occasion and threatened with incarceration in the penitentiary if she refused to testify against the defendant and adhere to some statement she had made before the grand jury. What that statement was was not and is not disclosed. These bills show that every time the attorney for appellant undertook to investigate what she said in the grand jury room, the court would sustain an objection on the ground that it was uncovering the secrets of the grand jury. The testimony that has been referred to herein is perhaps sufficient, without going further into the detail and showing the minutiae of these transactions and what occurred. The conclusion, from these recitations of the record, seems to be beyond cavil that Mr. Matthews was the attorney of this woman; that he had been employed by her and this defendant as well, when they were first arrested and put in jail; that he prepared bond for them and undertook to prepare the defense; that she had sent for him and stated that if he would not continue representing her in the case to secure the services of Honorable B. Q. Evans, also an attorney at the Greenville bar. This message was not delivered to either attorney by the jailer, or deputy sheriff. The court's idea seems to have been that because she had testified before the grand jury and the district attorney had agreed that he would not prosecute her if she testified and made a case against appellant, that she had deprived herself of the right of an attorney. How such a conclusion as this could have been reached is not readily perceived. Before answering she had the right to confer with her attorney about these matters, whether she was a witness or a defendant or both. Instead of giving her this right guaranteed by the Constitution and laws of this State, they placed her in jail, strictly incommunicado; the grand jury instructed the officer in charge of her not to permit anybody to talk to her and upon application by the attorney to the court, both

Judge Montrose and Judge Porter, in separate motions to that effect, the motions were overruled and they refused to let her communicate or advise with her attorneys about her legal rights, or what she should do in the premises, or whatever she desired to ascertain from her attorney. Even if it be conceded,—which the writer does not concede,— that they had the right to force her to testify under the circumstances, still she had the right to consult with her attorney as to what her rights were, even under a contract with the State if she had made such contract. Under her testimony there was no contract made. She testified that she was coerced into making statements under a threat if she did not do so, she would be prosecuted and sent to the penitentiary. She certainly had the right to confer with her attorney. The Constitution guarantees that everyone accused of a crime has such a right. The court seems to have overlooked Article 1046 of the Revised Penal Code (Art. 625 of White's Ann. P. C.) which reads as follows: "If any officers or other person having the custody of a prisoner in this State shall wilfully prevent such prisoner from consulting or communicating with counsel, or from obtaining the advice or services of counsel in the protection or prosecution of his legal rights, he shall be punished by imprisonment in the county jail not less than sixty days nor more than six months, and by fine not exceeding one thousand dollars." If the trial court or those interested in prosecution of this case had been preparing a case so that it would have been violative of this article, they could not have more fully come in violative contact with its provisions. An inspection of the terms of this article will show that if any person having custody of a prisoner in this State, whether it be officer or not, shall wilfully prevent a prisoner from consulting or communicating with counsel or from obtaining the advice or services of counsel in the protection or prosecution of his legal rights, he shall be punished. Both district judges seem to have been under the impression that because she had made a statement before the grand jury and the district attorney had proposed to dismiss the cases against her that, therefore, she was deprived of counsel in every way, even to advise or consult. It is not necessary that the party desiring counsel should be preparing a defense against some accusation after an indictment found or after arrest. The statute is broader and fully comprehends every possible situation in which an accused person or persons under arrest or not under arrest desire to consult with counsel, or communicate with counsel, or obtain advice or services of counsel in the protection of his rights, or even supposed legal rights. The court further was under the impression, it seems, that the authorities could force her to testify by intimidation or any other means, provided the State purposed to render her immune from prosecution and thereby prevent her from communicating with counsel or advising with counsel or obtaining the services of counsel. The court seems further to have been under the impression that because she was playing the part of

witness, therefore, the defendant in this case had no interest in the matter. In this the learned trial judge was mistaken, and mistaken in the face of the testimony of the woman and all the other circumstances connected with the whole transaction. This woman had testified before the grand jury; what that testimony was is not shown. Every time the defendant undertook to investigate the matter the court sustained the objection. Appellant had a direct interest in the impeachment of Annie Wood. He had a right to know her testimony, he had a right to prepare himself against this woman's testimony, especially in view of the fact that she did not want to testify in the case and was coerced into doing so. In order to ascertain what the testimony would be this defendant had the right to interrogate her, for she had been jointly indicted in the case and had employed Mr. Matthews to look after her case. Her case and the defendant's were so intermingled that the rights of the one could not be well separated from the other. Incest by the very terms of the statute is constituted and must be constituted by the intercourse,—in this case,—between appellant and Annie Wood. This was alleged in the indictment and appellant had a right to investigate the matter to know how far she had been coerced and to know what the parties coercing her were doing. The effect of this before the jury must, to some extent, be but conjecture. We are unable to tell what effect all this had before the jury when it was developed on the cross-examination of the witness as far as the court would permit that to go. When they proposed to ask whether or not she had been tortured, how she had been fed and what had been done to her in jail, most of this was excluded. They did, however, permit her to testify that she had been put in the death cell and two of the jurymen talked with her in the dark hours of the night, threatening to send her to the penitentiary if she did not swear away the liberties of this defendant. If these matters had been fully developed the verdict of the jury might have been much more favorable to defendant. If these facts had been developed the jury may have concluded that her testimony was false. We do know from this testimony that she was placed in the death cell in the dark hours of the night and threatened with a penitentiary conviction if she refused to testify. Under all of these circumstances this conviction ought not to stand. Under the testimony of the officer, the bill of exception and qualification of the judge, the evidence of Mr. Matthews, who also testified as far as the court would permit him, substantiating these matters, there has been shown a clear and palpable violation of Art. 1046 Penal Code, supra, and a clear and palpable violation of the Constitution and Bill of Rights.

2. Error is assigned upon the court's failure to charge the jury to the effect that if appellant had a living, undivorced wife at the time he married the mother of appellant, then the intercourse with this girl, if it occurred, could not constitute incest. Exception was reserved to the failure of the court to so charge the jury. This was

supplemented by written instruction requesting the court to submit the issue. The requested charge is in this language: "In this case the defendant's counsel requests the court to charge the jury, that if the defendant had a former wife, before they can convict it must appear from the evidence that the former wife was dead, or a legal divorce had been obtained prior to his marriage with the mother of Annie Woods." This was refused by the trial judge. It was an issue in the case made by the facts. Appellant testified that he was 63, going on 64 years of age; that he had been married several times; that the mother of Annie Wood was his last wife; that he had married previously in Utah in 1875 or 1876; that he had lived with his wife several years and couldn't say now whether she is living or dead, but thinks she is living, so far as he knew; that he had never heard of her death at any time and that he was never divorced from her; that he had not heard from her in eight or ten years; that the last time he heard from her she lived in Utah; that there was one child from that marriage; that he was under the impression that the child was in San Francisco; at least, the child was taken to San Francisco; that he did not know whether the child was dead or not; that it had diphtheria at that place or such was his information. He further testified that he had not been able to pay much attention to that marriage after he had to go into service; that he never knew or heard of her death at the time he married this last woman. The brother of appellant, W. H. Hamilton, testified that he was ten years the senior of appellant and he knew of the marriage by correspondence, etc., of his brother and his former wife and that his wife had such child, etc., living; that if she had ever died he knew nothing of it; that he had never heard of it. The court refused this special charge because he did not think this raised the issue. The court may not have believed the testimony. Probably did not believe it, but that is not a matter to be solved by the judge,—that is a fact for the jury under appropriate instructions. In McGrew v. State, 13 Texas Crim, App., 340, it is said:

"To establish the crime thus charged it was essential that the State should prove that Ann McGrew, the mother, was the *lawful* wife of defendant. It is shown by the evidence before us that the parties were married according to the forms of law. But the evidence further shows that a previous marriage had existed between Ann McGrew and one Andrew Jameson, and that the girl with whom the incestuous intercourse was had was the issue of this previous marriage. Nowhere, however, is it made to appear that at the time of the second marriage the first had been annulled, either by divorce. or by death of the first husband. Upon this point the only evidence in the record is a statement in the testimony of Ann McGrew to the effect that 'my first husband died in Grimes County, as I understand.' From this statement it is extremely uncertain that the first husband is dead; and, if dead, did he die before or after her second

marriage? If after, then the second marriage was a nullity, provided she had not been divorced from him, and she could not become the lawful wife of McGrew by virtue of such illegal marriage. If she was not his lawful wife, then the illicit connection of McGrew with her daughter by the previous marriage, however reprehensible in morals, would not constitute the crime of incest in law. Divorce from or the death of the first husband at the time of the second marriage should have been proven affirmatively, because absolutely essential to the establishment of the crime charged, and to the validity of a conviction under the circumstances stated.''

In Harville's case, 54 Texas Crim. Rep., 426 to 429, the McGrew case is followed. This quotation from the Harville case may be sufficient for this case: "Bill of exceptions No. 4 shows the State's counsel proved the following by J. W. Westerman: 'Do you know the general understanding as to where Mrs. Brotherton's first husband died and when he died?' Defendant objected to the question because it would be hearsay. The court overruled the objection. The witness answered that 'he was understood to be dead. I have heard Mrs. Harville state that he was dead.' The defendant objected to any statement made by Mrs. Harville, because no statement made by the wife is admissible against the husband. All of which objections were overruled. The witness continued to answer as follows: 'He died over at Mt. Vernon; some fellow killed him. Mr. Harville has been living down in that country about ten years; I did not know Mrs. Brotherton before she married Mr. Harville.' This bill is approved with this explanation: "No objection was made to the first question in the bill, that is, 'I have heard Mrs. Harville state that he was dead.' " Then follows the quotation already cited from the McGrew case. See also Stanford v. State, 42 Texas Crim. Rep., 343; Williams v. State, 86 Ga., 548. In McCombs v. State, 50 Texas Crim. Rep., 490, after an exhaustive research of the authorities, the proposition is laid down that while the previous wife was living and undivorced, a subsequent marriage would be illegal and would not create the legal marital relations in any way. The substance of that case is found in one of the head notes of the opinion as follows: "Where in a prosecution for bigamy, the evidence showed that defendant was legally married by virtue of a marriage license; that while this marriage existed, he entered into a bigamous marriage by virtue of a second marriage license; and about a year thereafter, the first wife obtained a divorce from him; that he continued to live with his second wife (who believed she was legally married to defendant by reason of the second marriage license) for about a year longer, when he finally separated from her, and some two or three years thereafter married a third wife by virtue of a marriage license, whereupon he was charged with bigamy. Held, that the prosecution could not be maintained. It is essential in this crime that the preceding marriage must be legal, and the next illegal; and inasmuch as the marriage preceding

defendant's last marriage was void and the last one legal, he was guilty of no offense.'' A great many cases and authorities are cited in the McCombs case unnecessary here to cite, but reference is made to that case for these authorities. The court erred in not submitting this issue and further erred in not giving the special requested charge.

3. There are several other question presented in different forms arising out of the action of the court in regard to Annie Wood, the manner of obtaining her testimony, her incarceration and refusing to permit counsel to communicate with her, all of which, we think, has been gone over in a general way without going over the different phases and branches thus presented.

4. There are quite a number of other interesting questions in the case that might be gone into and discussed, several of them growing out of the rulings of the court with reference to Annie Wood, conduct of the jury and the deputy sheriff and incidental matters of that sort, germane to the first question discussed in this opinion. We deem it unnecessary to go into them in view of what has been said.

As illustrative of the previous conduct and as a reason why the motion for new trial should have been granted, the following is set out in a bill of exception: ''My name is George Dugan; I am a deputy sheriff of Hunt County, Texas; I have been a deputy sheriff for more than a year preceding this time. There is a negro trusty down at the jail, named Roger Owens. He was down there during the period that Annie Wood was in jail. Yes, I sent some notes myself to the witness, Annie Wood. Yes, these notes purported to be from the defendant, E. B. Hamilton. She thought they were from him. Yes, I think she was convinced that the notes were from E. B. Hamilton. The notes were not signed by initials of E. B. Hamilton. Yes, these notes were in imitation of the defendant, E. B. Hamilton's, handwriting. Yes, I wrote them. In substance, the notes stated: 'If they take you out this evening, go ahead and talk, and tell the truth.' I wrote the notes myself.'' This was relied on, among other things, for granting a new trial. It is unnecessary to discuss this testimony and the effect of it, inasmuch as the case must be reversed on other questions. It shows, however, the general treatment of this witness and the defendant, and the unfairness of the trial and the manner of obtaining this conviction.

The judgment is reversed and the cause is remanded.

*Reversed and remanded.*

[Rehearing denied February 12, 1913.—Reporter.]