## Howard Venable v. The State.

### No. 4758.   Decided December 11, 1918.

**Rape—Witness—Manner of Examination—Coercing Witness.**

Where, upon trial of rape upon a female under the age of consent, the girl stated while being examined as a witness that her testimony before the court of inquiry accusing the defendant was not true and that she had been frightened into it by the prosecuting officer, etc., and she was then threatened with prosecution for perjury and was reminded by the court of the fact that he had the power to inflict the death penalty, etc., the same was not a proper examination of the witness and the conviction must be set aside. Following Hamilton v. State, 68 Texas Crim. Rep., 419. Prendergast, Judge, dissenting.

Appeal from the District Court of Armstrong. Tried below before the Hon. Hugh L. Umphres.

Appeal from a conviction of rape. Penalty, five years imprisonment in the penitentiary.

Defendant's bill of exceptions No. 1, hereinafter by the court directed to be included in the report of this case, is as follows:

Be it remembered that on the trial of the above entitled and numbered cause, and after the selection and empaneling of the jury, the reading of the indictment, and the entering of the defendant's pleas of not guilty, and after the witness Ola Fincher, the prosecutrix herein, had been by the State placed upon the witness stand, and after she had been examined as to an automobile ride, she, the defendant, one Irene Tucker, and one Von Rosenberg, had taken on the night of the 7th and morning of the 8th day of July, 1917, and prior to the time she had been asked whether or not the defendant had ever had sexual intercourse with her on said trip, and prior to the time she had been given opportunity to answer whether or not the defendant had ever had sexual intercourse with her on said trip or on any other occasion, but

after she had detailed said trip and had told certain places where the said automobile party had gone, the following proceedings were had, and parts of the proceedings had are set out in verbatim form herein, because the court and counsel deem it necessary to set out the questions in order to better elucidate the proceedings:

The district attorney asked the witness whether she remembered telling the grand jury of Donley County something, and she answered in the affirmative, whereupon the question was asked the prosecutrix whether or not that was the truth, whereupon counsel for the defendant objected to the question in the following language: "Now, your honor, we object to that; we believe it is improper, and, if it is for the purpose of impeachment, it is certainly improper, and, whatever the purpose is, it is irrelevant, immaterial, and prejudicial. We don't understand—I don't know what the purpose of the testimony is for, unless it is for impeachment purposes, and certainly is no predicate here that would justify an impeachment of his own witness." Whereupon the court instructed the sheriff to retire the jury, and the jury left the box in charge of the sheriff. "You may read the statement to the witness; now pay attention to it." And the district attorney immediately began reading to the prosecutrix a statement purporting to have been made by her in a court of inquiry as follows:

"The State of Texas, County of Potter. Be it remembered that on this the 9th day of July, 1917, an examining court of inquiry was duly organized, with C. G. Landis, justice of the peace, precinct No. 1, Potter County, Texas, presiding, and W. M. Burwell, sheriff, being present, and the proceedings were conducted by the State through her district attorney, E. T. Miller, whereupon the following testimony was adduced, reduced to writing, and subscribed and sworn to by the following named witnesses:

"Miss Ola Fincher having been duly sworn ⌣ ᴏne court testified as follows, towit: 'My name is Ola Fincher, I am thirteen years of age. I was thirteen on the 3rd day of January, A. D. 1917. I live in Amarillo, Potter County, Texas, at No. 1607 Buchanan Street. My father's name is W. F. Fincher. My mother's name is Deamon Fincher. I was in Amarillo on Saturday night, July 7, 1917. I left home that evening on the 8:15 car, and left town at 8:30 p. m.'" At which point in the proceedings had in this cause the defendant objected to the retirement of the jury in the following language:

Mr. Mood (counsel for defendant): "Mr. Miller, just a moment. Your honor, we will want a bill of exceptions to your honor's retiring the jury."

The Court: "Why, sure, that is all right; you can have your bill."

Whereupon the district attorney continued the reading of the same statement he had started to read to the witness, as follows:

"After getting off the car I came around to work with my sister, Mabel Fincher, at Nick's place on Taylor Street, and then I went to the show. I went to the Deandi Theater. We stayed until after the vaude-

ville performance, and then Irene Tucker and Mr. Gray drove up in front of the Deandi and asked us if we did not want to ride around. Nobody went with me to the show. I was by myself when I came out. After getting into the car we drove around up town with Irene Tucker and Mr. Gray and myself in the car, we drove around until time for sister to get off from work. It was 11 o'clock p. m. when we got my sister Mabel. I was still with Irene and Mr. Gray in the car. It was a Ford car, and we three were all that were in the car at that time. My sister Mabel then got into the car. The sailor boy and Mabel got into the car, and we all went around to the Deandi and got Billie Wilson. He got into the car with us at the Deandi Theater. After that we just drove around in the business part of town. We did not ride very long; we drove a while and then went to the Santa Fe depot to get some sandwiches; but we did not get any. While we were at the Santa Fe depot Buzz Venable drove up. He, Buzz Venable, called me, Ola Fincher, out to the car. He said to me, 'Ditch the boys; let's us, your sis, and Irene go riding.' I said, 'No, I won't do it.' So we all started up in the Ford again and drove out the Herring loop and back, and Buzz and Rosenberg followed us around. He drove up by our car and said to me, 'Meet us at the Golding drug store in ten minutes.' That was about 11:30 p. m. I did not say anything to him. We drove back out by the Sanitarium, and we turned around, and the driver, Mr. Gray, got mad at us. He had heard Buzz say 'Meet us at the Golding Drug.' He said, 'I will just put you out there'; and he put us out at the Golding Drug. All of we girls and Mr. Wilson got out at the Golding Drug. After we got out at the Golding Drug we started to walk home, and Buzz and Von Rosenberg drove up about the Methodist Church, and we got in the car. Mr. Wilson, Mabel, Irene and I all got into the car with Buzz and Von Rosenberg. After we got in the car we drove out east of town; we went out by Herring's, nearly to Canyon, Texas. We got off of the Canyon road, and went away west. I don't know just where. We rode about two or three hours out that way, and then we came back to town. We were out here in San Jacinto, and they got out to see how much gasoline we had. They found that it had run nearly empty; then we came up to the oil station on Taylor Street, Pierce-Fordyce filling station, and we got some gas and filled up the tank. We then went and took Mr. Wilson around to the Texan, the hotel where he stays. That left Mabel, Buzz, Von Rosenberg, Irene, and myself in the car. We then rode around up Polk Street, and then we went on home. Mabel and I both started to get out. Mabel got out, and Irene said, 'You are not going to leave me with both of the boys by myself?' Mabel says, 'I have to go to work in the morning, and I know that I am not going to stay with you'; and I said, 'I am not going to stay with you'; and when I started to get out she pulled me back, and Irene said, 'I wouldn't go home for $100.' Sis said, 'I will tell mother that you stayed all night with Slim.' Slim is Effie Rose. I knew that her first name is Effie. I think her last name is

Rose. They drove up, and we started on, Buzz, Von Rosenberg, Irene and myself. We drove out by Glenwood park, we went on past it, and then turned east down that public road. The public road is a quarter of a mile south of the park. We went east a long way; I don't know how far; it was about three miles east down the road. They stopped the car down there east somewhere, and Buzz was asleep, with his head in my lap, and his feet was in the other part of the car; we were on the back seat. Irene and Von Rosenberg were on the front seat. It was then that Von Rosenberg had intercourse with Irene there on the front seat of the car. Irene was lying down across the front seat of the car, on her back, and Von Rosenberg was lying on top of her, with his face toward her face. I went to sleep, and when I woke up he was going up and down on her. That was before we went south. When I woke up he started to drive the car, and he drove south, and we went in that direction about a mile. They then stopped the car again. They stopped by a haystack; the haystack was just inside the fence. I mean Von Rosenberg and Irene went to the haystack. Before Von Rosenberg and Irene went to the haystack, Buzz Venable had his hand on my person up under my dress. They went to the haystack. Buzz kept asking me to have intercourse with him, and I told him, 'No,' I was sick. He kept on, and pushed me over in the back seat of the car. After he pushed me over, he pulled up my dress. He took his pants clear down. After he took his pants down, he had intercourse with me. I know what intercourse is. No officer of the court has told me what 'intercourse' is. I know what intercourse means. Intercourse means when a man takes his penis and puts it into the private parts of a woman. I know what you mean when you say private female organ. He took his penis and put it in my private female organ. His male organ penetrated my female organ. After he had penetrated my female organ, his body went up and down, and I could feel his male organ within my private female organ. I could feel his organ inside of me. He went up and down on me a short time; that is, from one to two minutes, I would think. [He then] got off of me. I was in the back seat lying down, and he was on top of me, between my legs. It hurt me some when his penis entered my female organ. I suffered some pain from the act. I told him that it hurt me. The hurt was the greatest at the opening of my female organs. I told him that it was hurting me, and he got up; however, his male member went clear on into the inside of my female organ. He then got up. We got up and walked out to the barbed wire fence. We looked over the barb wire fence, and Von Rosenberg was on top of Irene; she was lying on her back. I could see her naked white limbs. Von Rosenberg was on top, going up and down. It was just a few feet away. Probably about twenty feet away. I saw a car coming, and I said, 'Come on quick!' They jumped up and got in the car, and we turned around and passed the car at a rate of about fifty miles per hour; then we went to Cliffside. We came to town and stopped at the post-

office. Buzz and Von Rosenberg went up in the St. Charles Apartments. They brought out one quilt. They got in the car, and we came around to the Merchants' Cafe on Taylor Street and got some sandwiches. We girls did not get out of the car. We then went out past Cliffside to the bridge across Amarillo Creek; it was about 5 o'clock in the morning when we got out there. Just before we got to Cliffside, Buzz wanted Irene to get up in the seat with him, and she got back there with Buzz, and I got up in front with Von Rosenberg. We rode that way until we got about two miles beyond Cliffside, and Von Rosenberg put the quilt down on the ground under a shade tree, and the car was about twenty feet away. Von Rosenberg said to me to come out there and sit with him on the quilt, and I did so. Buzz and Irene stayed in the car. They did not do anything for about fifteen minutes. Irene lay down on her back, and Buzz got on top of her, and they were going up and down; that is, Buzz was going up and down on Irene. He was on Irene about five minutes. After they finished, Buzz got up and pulled up his pants and buttoned them up. I did see them. There was nothing to obstruct my view in seeing them have the act of intercourse. I did not have intercourse with Von Rosenberg. We did not stay out there very much longer. We drove on out west after that. The reason we left was that we saw a car coming, and that car passed us. Louis Finklea and Mollie Carder passed by us. I did not hide. They passed us in a hurry. We stopped at a gate, drove into the field, and then we turned around and came back out of the field. We did not stop in the field. We came on back to town. Buzz gave Irene $2 and told us to go to a hotel. I said, 'I do not want to go to a hotel; I want to go home'; but Irene said that she was not going home, and would not let me leave her, so we went to the Cobb Hotel, 201 North Taylor Street, in Amarillo. They left us there. We stayed from that morning till about 4 o'clock p. m., when I called Mabel, and told her to come on over there. I said that I was going home, and I went on home with Mabel. Irene said, 'No, don't go home and leave me here'; and I said, 'The best thing for you to do is to go home, too.' But she did not go home. We left her there, and I have not seen her since. This is the 9th day of July, 1917, and I am well now, and I am not sick. I took my cloth off this morning. I think that the cloth is burned up. I am not sure that it has been burned. None of my clothing have any blood on them. My sickness came on me last Friday morning. Mr. Mood called up this morning, and my mother said that she did not want anything done about this matter. He called her over the telephone. All that I have told here is the truth. I have told it willingly. I have told what has happened without being scared, and not in response to set questions asked. You have only asked me for the truth. Ola Fincher.

"The cloth that I used was a white, cotton cloth; it did not have much blood on it. If it has not been destroyed, I will save it. Ola Fincher.

"Sworn to and subscribed to before me this the 9th day of July, A. D. 1917. C. G. Landis, Justice of the Peace, Precinct No. 1, Potter County, Texas. Sitting as an examining magistrate."

After the reading of which statement the following proceedings were had:

The Court: You may proceed with the interrogation.

Mr. Miller: Q. Miss Ola, do you remember Mr. Burwell on the morning of the 9th; that was Monday morning, wasn't it? A. Yes, sir.

Q. Coming out to your home and bringing you down to Mr. Johnson's office? A. Yes, sir.

Q. Up to that time, Ola, you had not communicated with anyone at all with reference to this particular transaction, had you? A. No, sir.

Q. You came down there, and we told you that the truth was what we were after, didn't we? A. Yes, sir.

Q. And we told you that Irene had told us what transpired on the night of the 7th, Saturday night, didn't we? A. Yes, sir.

Q. And we asked you if that was true, didn't we, in Mr. Johnson's office? A. I don't remember that.

Q. And you said, "Yes, it is true," didn't you? A. I don't remember.

Q. Do you remember relating to us the fact, leaving out the formal part of that you have already related, that Buzz had his head in your lap? A. Yes, sir; I remember that.

Q. And he was asleep, and that while asleep Von Rosenberg had intercourse with Irene on the front seat, did you? Didn't you do that? A. Yes, sir; I remember that.

Q. You remember that. You remember telling us that you were awake and that you saw it, and you remember then saying that they started up the car and turned south out of the east road—road running east and west—and turned south about a mile, and when you stopped there Irene and Von Rosenberg got out of the car and went to the haystack, and while Von Rosenberg and Irene were getting out of the car at that time Howard Venable had his hand underneath your clothing; that is true, isn't it? A. I don't remember.

The Court: Now, just a moment; let me see that, will you? A. I do not remember saying that—

The Court: Now, don't—you are under oath now, and let's just be careful about this. You signed that, did you (exhibiting paper to witness)? A. Yes, sir.

The Court: Swore to it? A. Yes, sir.

The Court: Well now, let me tell you something; it is rather a strange thing to me that you do not remember a matter of that kind now, and I assume that the district attorney has your statement made under oath down at Clarendon—I don't know what it is—to the grand jury down there, and it would be a heap better for you to go on and tell what happened there than it would for you to try to dodge around here—this "don't remember" business. You know you are a smart

girl; you are sensible enough. What grade are you in in school? A. Seventh.

The Court: In the seventh grade. Now, you remember thirty days ago; now, let me tell you something. I suppose—have you heard that it is an offense against the law to commit perjury? A. I don't know what you mean by that.

The Court: Well, that is to swear falsely on the witness stand; now, you are liable to the law and could be punished for violating the law. Did you know that? A. No, sir.

The Court: And it is a violation of law for you not to tell the truth. I want you just to go on and tell the truth, however it may be; you will save yourself trouble by it. A. That is what I want to tell.

The Court: Yes; well, all right; now go ahead and do it then. You may ask some more questions.

Mr. Miller: Q. You told Mr.. Burwell and myself and Mr. Ray Johnson that Von—that Howard Venable had his hand underneath your clothing, didn't you? A. I don't know.

Q. Ola, you weren't crying at the time, were you? A. No, sir; but the first time that anybody was ever before a bunch of men in a courthouse, you know anybody would be confused.

Q. Sure, and it was easier for you to tell a story at that time than it was the truth, is that it? A. Yes, sir.

Q. It was. Ola, Mr. Burwell told you that you were just like one of his own girls, didn't he, in there; and he told you he wanted you to tell the truth about it; that he was Mr. Frank Fincher's best friend, didn't he? A. Yes, sir.

Q. You remember that, don't you, Ola?; A. Yes, sir.

Q. And he said, "Ola, I wouldn't have you tell a falsehood at all," didn't he? A. I don't remember him saying that.

Q. You remember him saying that,. don't you, Ola? A. No, sir; I don't remember him saying that.

Q. And don't you remember that you told us that when they got out of the car that—the other two got out of the car that he laid you down on that seat, and that his private male organ penetrated your private female organ, didn't you? A. Yes; I remember saying that.

Q. You remember saying it, and, Ola, that is the God's truth, isn't it? A. No, sir.

Q. You know that you are under oath, don't you, Ola? A. Yes, sir.

Q. And you know that you swore and signed to this instrument I hold in my hand? A. Yes, sir.

Q. You saw your signature there, didn't you? A. Yes, sir.

Q. Did the court show it to you? A. Yes, sir.

Q. There is your signature on the first page, so that it couldn't be changed? A. Yes, sir.

Q. You remember signing every page, don't you? A. Yes, sir.

Q. And that is your signature there (indicating paper), isn't it? A. Yes, sir.

Q. And that is your signature there (indicating paper), isn't it?
A. Yes, sir.

.Q. And that is your signature there (indicating paper), isn't it?
A. Yes, sir.

Q. And that is your signature there (indicating paper), isn't it?
A. Yes, sir.

Q. And you held up your hand, didn't you, Ola? A. Yes, sir.

Q. You held up your hand there and swore to it; you remember that, don't you? A. Yes, sir.

Q. And you took this instrument, Ola, and it was read over to you, wasn't it, by Mr. Guleke? A. No; it wasn't read over to me.

Q. Well, you read it yourself there, didn't you? A. Yes, sir.

Q. You read every word in it, didn't you? A. Well, no; I didn't read it all; I was in such a hurry and worried.

Q. Who told you to say that? A. Nobody.

Q. Ola, you were in the room when I phoned your mother, weren't you, and asked her to bring you down to the office and let me talk to you? A. In the room when you phoned my mother?

Q. Yes, ma'am. A. No; I don't believe I was.

Q. Well, would you say so if you were? A. Yes, sir; I would say so if I were, but I don't believe I was in the room when you phoned my mother. I don't even remember you calling her up.

Q. Ola, you weren't excited down at Clarendon, were you? A. Yes, sir; I was excited.

The Court: Are you excited now? A. Yes, sir; I am excited now.

Mr. Miller: Q. Do you know what the penalty is for swearing a falsehood? A. No, sir.

Q. Do you know it is a penitentiary offense to set there and swear to a falsehood? A. I don't understand what you mean.

The Court: I will read it to you. (Reading): "The crime of perjury shall be punished by imprisonment in the penitentiary for a term not more than ten nor less than two years." Do you know there is a woman up there in jail now in Amarillo convicted and sent to the penitentiary for twenty years? A. No, sir.

Mr. Underwood: Your honor, we desire to take a bill of exceptions.

The Court: Well, certainly; you understood that you would get a full bill.

Mr. Mood: I understood that your honor was going to give us a full bill.

The Court: Certainly, if you get any advantage out of this, just go to it.

Mr. Mood: Well, we take an exception to that.

The Court: Certainly, you have got an exception to everything.

Q. You have been receiving company since you made that statement there to Mr. Miller? A. No, sir.

Q. Haven't gone with anybody? A. No, sir.

Q. Did you talk to Mr. Venable? A. No, sir; I have spoke to him.

Q. Not at all? A. I have spoke to him when I have been in the chocolate shop.

Q. Well, you talked to him, didn't you? A. No; I just spoke to him as I went in.

Q. And that is all? A. And that is all.

Q. Talk to Mr. Von Rosenberg? A. No, sir.

Q. Not at all? A. No, sir; I haven't seen him.

Q. Did Mr. Mood talk to you? A. I think Mr. Mood came out and talked to all of us.

Q. How often? A. He came twice.

Q. Well, you have your choice about this matter.

Mr. Miller: You can either, Ola, testify to the truth of the transaction or, I will be perfectly frank with you, be indicted for perjury; now, you can just go either route you want to go; now, I want to give you a fair show and warning.

Mr. Underwood: We take a bill to that.

The Court: Certainly, you get your bill to everything, you needn't take a bill any more; the stenographer is getting it.

Mr. Miller: You can do that, or you can substitute your virtue and your life in the penitentiary for the freedom of this man; do you want to do that? A. I want to tell the truth.

Q. No, you don't; you aren't telling the truth; you know that Irene Tucker isn't in the State, don't you? A. I don't know where she is.

Q. Well you know that she isn't in the State, don't you? A. Yes, sir.

Q. You know that; you have been told that, haven't you? A. Yes, sir.

Q. Who told you? A. Well, Miss Mathews told me that she was in Denver, Colorado.

Q. Miss Mathews? A. Yes, sir.

Q. When I told you that morning that I would have a doctor examine you, what did you say? A. What did I say?

Q. Yes, ma'am. A. I said I didn't want any doctor.

Q. You said further—what did you say further? A. I don't remember what all I said.

Q. You said that—then you began to relate to me the story, didn't you, right at the time? A. Yes, sir.

Q. And that is the truth, isn't it? A. No, sir.

Q. Didn't you?

The Court: What is the truth?

Mr. Miller: Didn't you tell those men down there in the grand-jury room at Donley County, after reading this statement to them, after being sworn, that this was the truth? A. You didn't read the statement.

Q. Didn't read the statement to you at all? A. No, sir.

Q. And you didn't relate there that what you had told there was the truth? A. Yes, sir.

Q. You told them that was the truth, didn't you? A. Yes, sir.

Q. And you told them that Howard Venable had intercourse with you there, didn't you? A. Yes, sir; I said that.

Q. And you said that was the truth, didn't you? A. Yes, sir.

Q. And it was the truth, wasn't it? A. No, sir.

Q. Who told you to say that it wasn't the truth? A. Nobody.

Q. Didn't your mother? A. No, sir.

Q. Did Mr. Mood? A. No, sir.

Q. Did Howard Venable? A. No, sir.

Q. What did Mr. Mood say to you when he was out there? A. He was just out there talking.

Q. Well, what did he say? A. About my age; he was asking my mother about my age.

Q. What did he say to you? A. He didn't say a thing to me.

Q. What did he say to your mother? A. He asked her about my age.

Q. What else did he say? A. I don't know what else he said; he was just talking about my age—wanted to know how old I was.

Q. And that is every word he said? A. Well, no.

Q. Now be careful. A. No; that wasn't all the words he said.

Q. Do you mean to tell me that you didn't make a statement to him there? A. No, sir; I didn't.

Q. Never made a statement to him? A. No, sir.

Q. Who told you not to say that you did? A. Nobody.

Mr. Miller: Well, I will file a complaint, judge; I am not going to monkey with no such business as this.

The Court: Do you care to examine the witness, Mr. Guleke; maybe she might remember, you took that down, didn't you?

Mr. Guleke: Q. Do you remember on the morning of the 9th of July? A. Yes, sir.

Q. Going downstairs in the courthouse? A. Yes, sir.

Q. Who was there? A. Well, you were there, and that Mr. Johnson, I believe that is his name, and Mr. Miller.

Q. Mr. Miller and Judge Landis? A. Yes; Judge Landis.

Q. Was he there? You sat on the left-hand side of the table, didn't you? A. Yes, sir.

Q. Across from me? A. Yes, sir.

Q. And I wrote on the typewriter? A. Yes, sir.

Q. And Judge Landis sat at the head of the table, you remember? A. Yes, sir.

Q. And Mr. Miller sat over on the same side of the table by you? A. Yes, sir.

Q. And you talked there for quite a while? A. Yes, sir.

Q. And as you testified I wrote it down on the typewriter? A. Yes, sir.

Q.  And after we had finished with your testimony we asked to read this over, didn't we?  A.  Yes, sir.

Q.  And you did read it over?  A.  Yes, sir.

Q.  And you told us that you had told all that you knew about it?  A.  Yes, sir.

Q.  Everything, and that it was the truth?  A.  Yes, sir; and said that.

Q.  And after reading it over carefully you signed your name to each sheet of paper, didn't you?  A.  Yes, sir.

Q.  And then you held up your hand and the judge swore you to it, didn't he?  A.  Yes, sir.

Q.  You swore to it as being the truth?  A.  Yes, sir.

Q.  And now you mean to come here and say that this is not the truth?  A.  That is not the truth.

Q.  After you have sworn to it there?  A.  Yes, sir.

Q.  And at Clarendon?  A.  Yes, sir.

Q.  Not the truth?  A.  No, sir.

Q.  Why did you swear to it?  A.  Well, I was just excited and everything; it was the first time I was ever in a courthouse.

Q.  You were excited?  A.  Yes, sir; and you had me all confused.

Q.  You were excited at Clarendon, were you?  A.  Yes, sir.

Q.  Very much excited.  Well, why did you persist in swearing to a falsehood?  A.  Well, I just didn't know what I was saying to all of those questions; they would say something, and I would answer "Yes" or "No" to it; I didn't know what half of those words meant that they were saying.

Q.  Don't you remember telling us this story?  A.  Yes, sir; I remember telling you that story.

Q.  You told us the story, didn't you?  A.  Yes, sir.

Q.  And every once in a while we would have to stop you, because I couldn't write it on the typewriter as fast as you could talk, isn't that a fact?  A.  Yes, sir.

Q.  And we told you we had plenty of time; just to take your time and we would get it all down in writing; that is a fact, isn't it?  A.  Yes, sir.

Q.  You weren't hurried at all, had plenty of time; and now you are going to come here under the sanction of an oath and say that you swore to a falsehood?  A.  Yes, sir.

Q.  I don't know of anything else.

The Court:  Let me have that statement.  I wish you would point out some of the words that you don't understand in there (handing paper to witness).  A.  (Reading statement.)  (Witness turns first page.)

The Court:  Didn't find any on the first page?  A.  No, sir.  (Reading.)  I don't know what that means (indicating).

The Court:  What is that, you don't know what "intercourse" is?  A.  No, sir.

Q. All right. A. Here is another one I don't know (indicating).

Q. "Penetrated"; don't know what "penetrated" is? A. No, sir; and I don't know what that means (indicating).

Q. "Penis"; don't know what that is? A. No, sir; and I don't know what you mean by this (indicating).

Q. Spell that. A. Female organ.

Q. You don't know what female organ is? A. No. sir. (Witness turns second page.) That is all.

Q. That is all you don't understand? A. Yes, sir.

Q. You understand all the rest of it? A. Yes, sir.

Q. Well, he did ask you here, "Buzz kept on after me to have intercourse with him, and I told him, 'No,' I was sick." What did you mean when he was asking you to have intercourse with you? A. He didn't say that. Irene said something. I said, "What do you mean?" and I said, "No, you won't either." I don't know what she said.

Q. What did you think he meant? A. Well, I didn't know; he didn't say nothing like that.

Q. Oh, well; you said that he did, didn't you, here? A. No; I didn't say that.

Q. You didn't say that? A. No, sir.

Q. Well, what did he say, then? A. He didn't say nothing; we just talked.

Q. Well, you just said just before that when he said something? A. He asked me, "What did she mean?" Irene told him to take me down, and he said, "What do you mean?"

Q. Said take you down where? A. Down in the back seat.

Q. Take you down in the back seat? A. Yes, sir.

Q. When you were sitting up there? A. Yes, sir.

Q. And he was on the front seat, and you were on the back? A. Yes, sir.

Q. And she just turned and told him— A. Him.

Q. Was that when Rosenberg was lying on top of her? A. Yes, sir.

Q. Well, what did you think they were doing? A. Well, I didn't pay much attention to them; I just went on talking to Buzz.

Q. Well, what did you think they were doing? A. I didn't think; I knew what they were doing.

Q. Well, what were they doing? What do you say they were doing? A. Huh?

Q. Do you know what they were doing now; have you forgot what they were doing? A. No, sir.

Q. Well, what were they doing? A. Well, he was going up and down on her.

Q. I know; but—what did you think that amounted to? A. I didn't know.

Q. Well, all right. "After he pushed me over and pulled up my dress, they went on to the haystack. Buzz kept after me to have inter-

course with him, and I told him, 'No,' that I was sick." What do you mean by sick—headache? A. No, sir; my monthlies were on.

Q. You know what "monthlies" is all right? A. Yes, sir.

Q. But you don't know what female organ is? A. No, sir.

Q. You know what male organ is? A. No, sir.

Q. Well, here it is; you didn't call my attention to it; there it is, right there. Didn't you say, "I could feel his male organ within my private female organ," and you know what your private female organ is? A. No, sir; that is what I showed you I didn't know.

Q. And here is "His private male organ." You didn't tell me about that, did you? A. No, sir; I must have overlooked that.

Q. Uh, huh! you don't know what a male organ or a female organ is, either? A. No, sir.

Q. Well, what did you say, "I know what intercourse means?" You said it there, didn't you? A. No, sir.

Q. You didn't say that? A. No, sir.

Q. Well, what in the world did you sign that for, then? You read that over, didn't you? A. No, sir; I didn't read it all over; I wanted to get home.

The Stenographer: How is that? A. I wanted to get home.

The Court: Q. You wanted to get home? A. Yes, sir; and I just don't know what all I said.

Q. Well, I am afraid you are very unfortunate in being in such a hurry at that time. Well, do you know what "inside" of you is? A. Yes, sir; I know what "inside of me" is.

Q. What did you mean when you said, "I could feel his male organ within my female organ; I could feel his organ inside of me"? A. I didn't say that.

Q. You didn't? A. No, sir.

Q. And you say these four or five men around here that were all present and saw this thing written down, the sheriff of the county, and the district attorney, and Mr. Gulcke, and the county attorney, Mr. Johnson, and Mr. Landis? A. Yes, sir.

Q. "He went up and down on me." Did he go up and down on you like this? A. No, sir.

Q. How did he go up and down on you? A. He didn't even bother me.

The Stenographer: What? A. He didn't even bother me.

The Court: · Q. What do you mean by "bother you"? A. Well, what you said there; he didn't even go up and down on me.

Q. Well, "I told him that it hurt me." What was it—what was hurting you? A. I didn't say anything was hurting me.

Q. You didn't say that anything was hurting you? A. No, sir.

Q. "The hurt was greatest at the opening of my female organ"? A. I don't know what that means.

Q. What did you mean by that? A. I don't know; there are lots

of things there that I don't know what they mean at all; I haven't the slightest idea.

Q. Well, why didn't you tell it a while ago, when I told you about everything you didn't understand? A. I told you all of those things.

Q. Well, you got up and walked out to the barbed wire fence, did you? A. Yes.

Q. You remember that, don't you? A. Yes, sir.

Q. Where did you get up from? A. We got out of the car there where we were sitting.

Q. Neither one of you laid down at all? A. No, sir; he laid down, and was asleep with his head in my lap, and his feet out of the door there.

Q. Did he hug you and kiss you? A. Yes, sir; he hugged me and kissed me on the side of my face.

Q. Well, you said, "We looked over"; you remember going up to the barbed wire fence, "that we got up and walked out to the barbed wire fence, we looked over the barbed wire fence, and Von Rosenberg was on top of Irene, and she was laying on her back"—do you remember that? A. Yes, sir.

Q. You remember that? A. Yes, sir.

Q. You remember that, and you remember that in the car, too, when she was laying on her back in the car? A. Yes, sir; I remember that, and I remember back in the car.

Q. And he was going up and down on her there; what did you think of that kind of carrying on, anyhow? A. Well, I just thought it wasn't very nice and wanted to go home.

Q. Well, what did you think they were doing, huh; did you think they were having intercourse? A. I don't know what intercourse means.

Q. Well, tell me what you think they were doing, then, if it wasn't so nice; tell me just anything you want to call it. A. They were doing something is what I would call it.

Q. They were doing something? A. Yes, sir.

Q. Something that wasn't nice? A. Yes, sir.

Q. Well, what did you think they were doing that with? A. I didn't know.

Q. What did you think they were using to do something that wasn't nice? A. I guess they were using their own things.

Q. Their own things, private female organ and private male organ? A. I don't know what you mean by that.

Q. Oh, yes. Well, you just—they were just using their things then? A. Yes, sir.

Q. His male thing and her female thing? A. I don't know what you mean by that.

Q. You don't know what male and female is? A. No, sir.

Q. You don't know whether you are a female or not? A. No, sir.

Q. You don't? A. No, sir.

Q. Well, I don't see how you ever got into the seventh grade; you

don't know whether you are a female or a male; don't you see how ridiculous that is; can't you see how perfectly absurd it is? A. No, sir.

Q. You can't! All right, we will see some more, then. "I could see her naked white limbs from the barbed wire fence"; you know you say you saw them doing something that wasn't nice there? A. Yes, sir.

Q. He was down between her limbs? A. Yes, sir.

Q. And you could see her naked limbs there? A. Yes, sir.

Q. Well, that legs was it? A. Yes, sir.

Q. Limbs; you know what limbs are? A. Yes, sir.

Q. And she was laying on her back? A. Yes, sir.

Q. You saw that? A. Yes, sir.

Q. You remember that all right? A. Yes, sir.

Q. Von Rosenberg was going—was on top, going up and down; it is just about twenty feet away? A. Yes, sir.

Q. That is correct is it? A. Yes, sir.

Q. "I saw a car coming, and I said, 'Come on quick!'" Is that what you said? A. Yes, sir.

Q. "They jumped up, got in the car, and we turned around and passed the car at the rate of fifty miles an hour and went to Cliffside. We came to town, stopped at the postoffice." You remember that, of course? A. Yes, sir.

Q. Buzz and Von Rosenberg went up in the St. Charles Apartments and brought out a quilt? A. Yes, sir.

Q. "They got in the car and we came around to the Merchants' Cafe on Taylor Street, and got some sandwiches." You remember that, all right? A. Yes, sir.

Q. "We girls didn't get out of the car; we just went out there past Cliffside to the bridge across Amarillo Creek; it was about 5 o'clock in the morning when we got out there." That is all correct, isn't it? A. Yes, sir.

Q. "Just before we got to Cliffside, Buzz wanted Irene to get up in the back seat with him"? A. Yes, sir.

Q. That is correct is it? A. Yes, sir.

Q. "And she got back there with Buzz, and I got up in front with Von Rosenberg, and we rode that way until we got about two miles beyond Cliffside"? A. Yes, sir.

Q. "And Von Rosenberg put the quilt down on the ground under a shade tree"? A. Yes, sir.

Q. "And the car was about twenty feet away"? A. Well, it wasn't that far.

Q. Well, it was a short distance, then, was it? A. Yes, sir.

Q. "Von Rosenberg said to me, 'Come out here and set down on the quilt with me.'" Did he say that to you? A. No; he said, "All of you come, and let's eat the sandwiches."

Q. Well, all right; but you went, all right? A. Yes; we all went.

Q. "Buzz and Irene stayed in the car"? A. Yes; they stayed in the car.

Q. So it was just you and Von Rosenberg out there after all, wasn't it? A. Yes, sir.

Q. "Irene laid down on her back, and Buzz got on top of her"? A. I don't know.

Q. "And they were going up and down." Do you remember whether they were going up and down? A. No, sir.

Q. You just don't remember that? A. I didn't look.

Q. You would not say that they didn't? A. No, I wouldn't say that they didn't, nor I would not say that they did, because I don't want to say.

Q. Were you afraid that they were going to do something that wasn't nice? A. No, sir· I didn't think nothing about it; that was not on my mind.

Q. No; well, after seeing Von Rosenberg and Irene there twice, you then didn't think about it any more? A. No, sir; I didn't think about it then.

Q. Well, what did you think about Von Rosenberg and Irene there? A. Well, I didn't have much think coming about then; I just thought they wasn't nice.

Q. Well, it wasn't? A. No; it wasn't.

Q. No; that is the way you looked at it, isn't it? A. Yes, sir.

Q. "And he was on Irene about five minutes"? A. I don't know; I don't remember.

Q. You don't know how long he was on? A. I don't know he was even on.

Q. Uh, huh! "After they finished, Buzz got up, pulled up his pants and buttoned them up"? A. I saw him pull up his pants when they got out of the car.

Q. You did see that? A. Yes, sir; I saw that.

Q. That is the only thing you remember seeing? A. Yes, sir; I remember seeing that.

Q. They didn't put that down wrong? A. No.

Q. He was pulling up his pants and buttoning them?. A. No; I didn't say buttoning them; I just saw him catch his pants like that (indicating) and pull them up.

Q. Oh! "There was nothing to obstruct my view in seeing them"? A. No; there was nothing in the way.

Q. "Nothing to obstruct my view in seeing them have the act of intercourse"? A. No, sir; I don't know what intercourse means.

Q. Of course, you don't know what intercourse means? A. No, sir.

Q. Not even to this good minute? A. No, sir; I don't yet.

Q. Well, we will say "doing something that wasn't nice," like you were trying to tell a while ago. "I did not have intercourse with Von Rosenberg"? A. No, sir.

Q. You didn't? A. No, sir.

Q. You know what intercourse is now? A. Yes, sir; I know what intercourse means now.

Q. Well, we will say that female organ is her thing. A. Her thing.

Q. And male organ is his; do you understand it all now? A. Yes, sir.

Q. All right; you did not stay out there very much longer; that is correct, is it? A. Yes, sir.

Q. "We drove on out west after that"? A. Yes, sir.

Q. "The reason we left was that we saw a car coming, and that car passed us. Louis Finklea and Mollie Carder passed by us." Did they? A. Yes, sir.

Q. "I did not hide." You didn't, I suppose? A. No, sir.

Q. "They passed us in a hurry," all right; "we stopped at a gate, and drove into a field, and then we turned around and came out of the field"? A. Yes, sir.

Q. "We did not stop in the field; we came back to town. Buzz gave Irene two dollars"? A. Yes, sir.

Q. He did that, did he? A. Yes, sir; he gave her two dollars.

Q. All right; did he do that after he had pulled his pants up and buttoned them? A. Yes; but she asked him for it. She said, "I want to get me a room; I am not going home."

Q. Uh, huh! "I said, 'I do not want to go to a hotel'"? A. Yes, sir.

Q. Of course, you didn't. "'I want to go home,' but Irene said she was not going home, and would not let me leave her. We went to the Cobb Hotel, 201 Taylor Street, Amarillo"? A. Yes, sir.

Q. "They left us there; we stayed there from that morning until about 4 o'clock p. m., when I called Mabel"? That is your sister? A. Yes, sir.

Q. You did call your sister, did you? A. Yes, sir.

Q. "And told her to come on over there, and I said that I was going home, and I went on home with Mabel. Irene said, 'No, don't go home and leave me here'; and I said, 'The best thing for you to do is to go home, too.'" You did that? A. Yes, sir.

Q. "But she did not go home; we left her there, and I haven't seen her since." Have you seen her at all today? A. No, sir.

Q. Haven't seen her at all today? A. I haven't seen her at all.

Q. How is that? A. I haven't seen her at all.

Q. And if she is in town you don't know anything about it? A. No, sir.

Q. Well, now, let's see if you understand this. You drove out past Herring's, did you? A. Yes, sir.

Q. Nearly to Canyon, Texas? A. Yes, sir.

Q And then got off the Canyon road and went west? A. Yes, sir.

Q. And Irene said she wouldn't go home for $100," did she? A. Yes.

Q. "Sis said, 'I will tell mother that you stayed last night with Slim.' Slim is Effie Rose." That is true, is it? A. Yes, sir.

Q. "We went a long way; I don't know how far it was; about three miles east." Is that about right? A. Yes, sir.

Q. "They stopped the car down there east somewhere, and Buzz was asleep"? A. Yes, sir.

Q. "With his head in my lap and his feet were in the other part of the car"? A. Yes, sir.

Q. "We were on the back seat"? A. Yes, sir.

Q. I believe you said all that is true? A. Yes, sir.

Q. "Irene and Von Rosenberg were on the front seat." You told that? A. Yes, sir.

Q. "It was then that Von Rosenberg had intercourse with Irene there on the front seat of the car"? A. Yes, sir.

Q. Well, now, when you said that they had intercourse, of course you know now what it means, because I have told you? A. Yes, sir.

Q. But when you said it at that time, didn't you think that that getting on top of her and going up and down was intercourse? A. No, sir; I didn't have the slightest idea.

Q. Well, what did you think that was? A. I didn't know.

Q. And you didn't think that was intercourse? A. No, sir; I didn't know what intercourse meant, and I asked my mother to tell me, and she said, "No," she wouldn't do it.

Q. She wouldn't do it? A. No.

Q. Well, did you ask if that was doing something that wasn't nice? A. After she said that, that she didn't want me to know what that meant, I didn't ask her any more.

Q. You are thirteen years old, are you? A. Yes, sir.

Q. Do you feel like you were well treated that night? A. Yes, sir.

Q. Feel like Irene was well treated? A. Well, she might say she was; but I don't think she was myself.

Q. You think she lost her virtue that night do you? A. Yes, sir.

Q. You know what virtue is? A. No; I don't know what virtue is.

Q. Oh, don't you; you said that before you—let's have quiet—didn't you? A. Yes, sir.

Q. Yes; you haven't lost your virtue? A. I don't know what it means.

Q. Well, you have never had intercourse with any boys? A. No, sir.

Q. You are willing to let the doctor examine you, I suppose, to see if it is true that you haven't had intercourse? A. Yes, sir.

Q. Well, it would very much shorten this trial to do that.

Mr. Miller: Owing to the lateness of the hour, I would like for the court, if he will, to adjourn until in the morning, and give me an opportunity to have the young lady examined.

The Court: Well, I will just hold the court open; I am going to hold the court open until I am satisfied. A. I don't have to, unless I want to, do I?

The Court: How's that? A. I don't have to unless I want to, do I?

The Court: Have you decided that you don't want to? A. Yes, sir.

The Court: Well, if there is anything else, any other step you care to take the court is open here.

Mr. Miller: I want to file, and I will prepare it now, a complaint charging perjury against the girl for testifying falsely in the court here.

The Court: All right, the court is open.

Mr. Miller: Judge, there is one question I want to base it on that I want to ask her—well, I can base it on this business here and I want to, if the court wants some action taken, to withdraw my announcement of ready for trial in this case.

The Court: I don't think you can; we can hold this court open for a year if necessary, and we will do it.

Mr. Miller: All right; I would rather do that.

The Court: All right.

The Court: I am going to have to present an order here; perhaps you had better sit down over there, little girl, a minute (indicating witness stand) ; owing to the circumstances this afternoon, it becomes my duty, and a painful duty it is,too, to enter an order against you in this case like this:

"Be it remembered that on the trial of the above entitled and numbered cause came Ola Fincher, as a witness called by the State, and it appearing to the court that said witness has knowledge of material facts which she has testified to in the absence of the jury, but which she refused to testify to in the hearing of the jury, and persisted in claiming not to remember, wherefore it is considered by the court that said witness, Ola Fincher, is in contempt of this honorable court, and is attempting by said conduct to hold this court in contempt and without power and authority to compel truthful answers to fair questions; therefore it is considered, ordered, and adjudged by the court that said Ola Fincher be committed to the custody of the sheriff of this county until she purges herself of this contempt, which may be done by said witness giving answers to the questions aforesaid in truthful, fair manner at any time when the court shall designate that it is ready to hear such witness' testimony, and the clerk of this court is ordered to issue commitment in accordance with this order."

You may enter this, Mr. Clerk, and enter the commitment. The court will remain in session a fewminutes until you get that order. By the way, little girl, the court, of course, will be in session in the morning at 9 o'clock, and will continue in session. I can hold court just as long as I want to, and it will be here whenever you have purged yourself of the contempt in which you are holding the court, this order will be revoked or will be satisfied.

Tuesday morning, August 14th, 9 o'clock a. m.

The Court: Do you care to interrogate the witness?

Mr. Miller: Yes, sir.

The Court: Proceed.

Mr. Miller: Q. Miss Ola, you heard the statement read to you by the court and by myself and by the court in detail yesterday evening, did you? A. Yes, sir.

Q. And since your memory has been refreshed with reference to the statement made by you on the 9th—I believe it is the 9th day of July of this year—I want to ask you with reference to certain transactions had now. You testified that it was on Saturday night that you were out with Buzz on the back seat of a Haynes automobile east of Amarillo—southeast of Amarillo on a public road near a haystack, the haystack being on the left-hand side of the road and the car was headed south, wasn't it? A. The car was headed north.

The Stenographer: How is that? A. The car was headed north.

Mr. Miller: Headed north. I will ask you to state while you were out there if you were on your back in the seat of the automobile, back seat? A. You ask me to state what?

Q. Whether or not you were lying on your back on the back seat of the automobile? A. When?

Q. That night, the night of the 7th, Saturday night, when you were out there near the haystack? A. I don't understand what you mean.

Q. Well, you were on your back on the back of the seat, were you not? A. Yes, sir.

Q. And he was on top of you, Howard Venable? A. (No answer.)

Q. Just answer the question: Was Howard Venable on you? A. (No answer.)

Q. Huh? Tell the court whether or not he was on you at that time. A. (No answer.)

The Court: I don't like—it is a disagreeable thing, of course, to have you to sit here and detail matters of this kind, but there are twelve men waiting here for you to tell that story, whatever it is, and I wish you would go on and say what you have to say.

Mr. Miller: Answer the question, Ola. A. (No answer; witness biting finger nails.)

Q. Well, he was on your person—

Mr. Miller: I beg your pardon.

The Court: Would you rather have the jury come down at this time, so that when you are through telling whatever your story may be that you may not have to tell it again? Would you rather do that? The jury isn't in here now, you understand. Would you rather they would come down now, before you tell what you have to tell, or not? What is the trouble you don't talk? A. (No answer.)

Mr. Miller: Ola, what were you doing on your back on that seat? A. Well, my back was up against the back seat of the car.

Q. Well, you said a while ago you were on your back in the seat. Who was on you at that time? A. Nobody.

The Court: Mr. Sheriff, you can take the witness to jail; this court is going to hold open until you decide to talk now, and you are going to be kept in jail, you understand. I can't fritter away the time of the

court in this way. I am sure that is a disagreeable thing for you to talk about matters of this kind, but you aren't doing it voluntarily. The court has brought you in here for that purpose, and I suppose that you understand that the District Court can pronounce the sentence of death upon a person, actually take the life of a person; you knew that, didn't you? A. Yes, sir.

The Court: And for you to sit here and take up the time of the court by being obstinate is very much out of line with right, to say the least of it. Would you want the jury to come back and go ahead and tell what you want to tell, or would you rather go on to jail now. It is just one way or the other. What do you say about it? What are you looking over there for?

Mr. Mood: I just arose, your honor; I was waiting until your honor got through; I want to take a bill.

The Court: What do you say about it? A. Well, I would rather tell what I have to tell.

The Court: How is that?. A. I would rather tell what I have to tell.

The Court: Do you want the jury to come in, then? A. It don't make any difference to me.

The Court: Well, all right; answer Mr. Miller's question, then, and we will see.

Mr. Mood: Just a moment; I understand that we have a bill to all the court's remarks?

The Court: Oh, yes, sir.

Mr. Mood: Especially the threat to send her to the penitentiary and the threat of death.'

The Court: Sure, that is right; whatever was said. You didn't understand me to say that I was threatening to put you to death, did you? A. Yes, sir.

The Court: Well, I didn't mean that at all. I mean that this court is powerful enough to put to death a person—an offender against the law—and it would be a very weak court that wasn't able to compel witnesses to come here and give testimony. '

Mr. Mood: Well, your honor, I am sure that she understood—

The Court: Now, I don't care to hear from you further, Mr. Mood, on this subject; you have got your exception all the way through, and you have a record, and I don't propose to hear anything further on this subject.

Mr. Mood: Well, defendant excepts to the court's refusal to hear a bill of exception.

The Court: Most assuredly.

Mr. Miller: Now, Ola, you told me yesterday evening that you were coming on the witness stand and testify to the truth about this transaction, and this statement was the truth, didn't you? A. I told you I was going to tell the truth.

Q. You told me that this statement was the truth right there yesterday evening about 6 o'clock? A. Yes, sir.

Q.  That this statement was the truth, didn't you?  A.  Yes, sir.

Q.  Now, I want to ask you if it isn't a fact that Buzz Venable's private male organs penetrated your private female organs; answer that question "Yes" or "No"; that is in this statement, isn't it?  A.  Yes, sir.

Q.  All right; did he or not?  A.  (No answer.)

The Court:  What do you hesitate for, little girl?  What are you hesitating about?  A.  (No answer.)

Mr. Miller:  Ola, you had your cloth on that time, didn't you?  A.  Yes, sir.

Q.  He undone the cloth, didn't he?  A.  No, sir.

Q.  Didn't you tell me in the presence of Mr. Burwell and Mr. Johnson that he removed the cloth?  A.  Yes, sir; I told you that in the presence of Mr. Johnson and Mr. Burwell.

Q.  And that is true, isn't it?  A.  No, sir.

Q.  And that you were placed upon your back in the back seat of the car, and that he got on your person between your limbs, and that he placed his private male organ in your private female organ; that is true, isn't it?  A.  No, sir; that is what I told you, though.

Q.  And you told me that it was true.  Now, why is it that you don't say that it is true here?  A.  Because it isn't.

Q.  You say you went——

The Court:  I don't feel that the witness has purged herself of contempt you may—there are some jurors sick—  A.  I don't want to go to jail.

The Court:  Go right on to jail.  A.  I don't want to go to jail.

The Court:  What?  A.  I don't want to go to jail.

The Court:  I know you don't.

The Sheriff:  Come on, let's go.  A.  (Witness remains seated.)

The Court:  Well, what do you want to do?

The Sheriff:  Come on, we will go down.  A.  I don't want to go down.

The Sheriff:  Well, come on; let's go anyhow.  A.  Well, I won't go.

The Sheriff:  I am sure you don't want to go.  A.  You aren't treating me fair enough.

The Court:  Well, in what way are you not being treated fair enough?  A.  (Crying.)

Mr. Miller:  The great trouble is you aren't treating yourself fair, Ola; that is the great trouble.

The Court:  Well, what do you say now?  When you get through crying you may talk.

Mr. Miller:  Now, Miss Ola, I believe you stated a while ago what was in this statement was true, didn't you?  Answer the question "Yes" or "No."  Didn't you?  You stated what was in this statement that had been read to you by myself and the court was true, didn't you huh?  You can answer that "Yes" or "No" now?

The Court:  Wait until she gets through crying.

After which proceedings, at 2 o'clock p. m., the jury were returned

to the jury box and the examination of said witness continued in their presence and hearing. To all of which proceedings so had as above set out the defendant then and there in open court duly excepted, and here now tenders this his bill of exception No. 1, and prays that the same be approved, ordered filed and made a part of the record herein, which is accordingly done, and the above bill of exceptions is prepared largely in verbatim form; the court being of the opinion that such questions and answers are necessary in order to elucidate the facts and questions involved.

The foregoing bill is approved with the following qualifications: The witness Ola Fincher had not testified fully with reference to the automobile trip and had not been directly interrogated as to an act of sexual intercourse between her and the defendant, but she was answering questions leading up to the main issues in a way which clearly indicated her leaning towards the defendant, which she admitted in the trial of the case. She was very much opposed to the prosecution, and admitted on the stand that she did not want the defendant punished. The atmosphere of the trial at that stage of the trial was the most unusual. The defendant was at that time, and at all times until the retirement of the jury, and for the most part after the retirement of the jury, making signs, gestures, and nodding his head, and he was constantly looking at the witness, as if he considered himself possessed of some occult power over her, reminding gme of a cat undertaking to charm a bird, and at one time I had to ask the witness why she looked at the defendant before answering. The district attorney was undertaking to have the witness testify concerning matters which would have been wholly irrelevant and immaterial, except for the purpose of showing the jury the kind of witness before them, in order to enable them to pass upon her credibility and to test her memory, when he said: "Do you remember Mr. Ritchey, the county attorney at Clarendon?" She said that she did not, and he asked her if she remembered telling the grand jury of Donley County something, which she answered in the affirmative. She was then asked if that was the truth, when counsel for defendant objected because it was improper, irrelevant, immaterial, and prejudicial. The court then said, "Mr. Sheriff, I wish you would retire the jury a few minutes." Then the transcript of the testimony taken before the court of inquiry was exhibited to the witness, and she was examined quite at length by the district attorney, court, and the district attorney's law partner, who was assisting gin the prosecution. The circumstances of the trial as developed convinced the judge beyond all question that the witness, who was a thirteen-year-old girl, was under the influence of some person. There were two young girls, the defendant and another, involved in the transaction, and the witness was one of the girls. One of the young girls and her mother had gone from the State and were beyond the jurisdiction of the court before subpoenas could be served; and it developed that both the young girls, their mothers and fathers were unfriendly to the prosecution, and were doing everything

within their power to prevent a prosecution. The witness Ola Fincher answered promptly the questions propounded by defendant's counsel, but was neither prompt nor truthful, in the opinion of the judge, in answering questions propounded by State's counsel. Her attitude was so contemptuous that the court remanded her to the custody of the sheriff, who kept her at his home over night, and under these circumstances, and with such influences working, the judge of this court felt and still feels that it was proper to protect the court's jurisdiction, and that it would not have been protected if the defendant and his counsel had then had the opportunity of discussing the case with her. In my opinion the slightest encouragement which might have been possible from the mere fact that counsel for defendant be accorded the right at that stage of the proceedings to discuss the matter with her would in the opinion of the judge have thwarted the purpose of the law, to compel witnesses to respect their oath and testify truthfully to facts within their knowledge. But before the cross-examination of the witness the court did inform defendant's counsel that it was their privilege now to talk with the witness, and they availed themselves of the opportunity; the court taking a recess and giving them the opportunity, and the jury not knowing the purpose for which the recess was taken. The statement taken before the court of inquiry is shown in bill of exception No. 1, and in addition to this the defendant introduced in evidence a statement given by the witness at his instance, which is shown in the statement of facts at page 64.

The jury would have had no reason for knowing what was transpiring in their absence, in my opinion, and I am not aware, and have not been informed, that they did know what was transpiring in their absence, and when they returned into court the judge merely said to the witness Ola Fincher, "Do you feel well enough or able now to testify?" and she answered that she didn't feel so very good, and the district attorney then began propounding questions to her. Nothing was mentioned in the direct examination by the district attorney relative to what had transpired in the absence of the jury, and when defendant's counsel began cross-examining her they undertook to and did develop what they considered important to them pertaining to the proceedings had in the absence of the jury.

Contempt proceedings against the defendant were initiated after the trial, and while the court had no doubt, and so stated to the defendant, of his guilt, yet the defendant broke down in that proceeding, and with tears in his eyes said that he did not intend any contempt of court by the signs he was making, and did not know he was doing anything in the trial to bring himself in contempt, and he was a young man about twenty-one years of age, so he was discharged for the reason that it was thought best that the court under those circumstances might perhaps be merciful without injury to the defendant, or the court's dignity.

HUGH L. UMPHRES, Judge.

H G. Hendricks, Kimbrough, Underwood & Jackson, and A. M. Mood, for appellant.—On question of coercing witness: Patterson v. State, 60 S. W. Rep., 557.

E. B. Hendricks, Assistant Attorney General, for the State.

DAVIDSON, PRESIDING JUDGE.—Appellant was convicted of rape on a girl under fifteen years of age, the facts showing that she was between thirteen and fourteen years of age.

There is a very lengthy bill of exceptions found in the record covering nearly forty pages. The length of this bill is explained on the theory that the matter could not be made manifest to this court except by setting out all of the matters as they occurred with reference to the prosecuting witness. Before being asked with reference to the facts of the alleged rape, the district attorney and his associate were permitted to examine and cross-examine her mainly in the absence of the jury with reference to her testimony given before a court of inquiry. The court in his qualification of the bill anticipated that she would not testify on the trial before the jury as she had done before the court of inquiry, and also as it was claimed she did before a grand jury in Donley County. The examination was rigid. The girl stated while being examined that her testimony before the court of inquiry was not true, and that she had been frightened into making it by the prosecuting officers and other officers who were present, and that the parties who took down the statement wrote many things into the statement which she did not state and which were not true, and that she was badly frightened. This examination on the final trial lasted for a part of two days, if not nearly all of two days. She was threatened with prosecution for perjury, and was reminded of the fact by the court that he had power to inflict the death penalty, and that he had just sent one woman to the penitentiary for twenty years, and that the prosecuting witness herself could be sent for perjury, and the district attorney in her presence threatened to prepare a charge of perjury against her. The court acted upon the theory that she was not telling the truth if she failed or refused to repeat her testimony as given before the court of inquiry, and that he had authority as a court to require her to testify before the jury as she had testified before the court of inquiry. After committing her to custody over night and the subsequent threat to send her to jail she testified in accordance with their wishes, but before and after so stating she denied the truth of it. She made statements to her mother directly after the examination by the court of inquiry, that she had been threatened in making her statement, and that they were not true, and was chided by her mother for telling a story. She stated they had "scared" her. She also made another statement which is shown in the record under oath denying appellant's guilt, or that he had had intercourse with her. The testimony introduced by the defendant strongly supports the theory that he had not had inter-

course with her. It is uncontroverted both by prosecutrix and her mother that she had her monthly sickness,—menstrual discharge, and "was flooding at the time" of the alleged occurrence, and her "wrappings" were not disturbed. The city jailer and county jailer also testified to the fact that appellant was almost immediately arrested; that the clothing worn by appellant on the night of the supposed rape had not been changed at the time of his arrest, and had no blood upon them, which would have occurred had he had intercourse with the girl under the circumstances. These matters are briefly stated. The reporter will include in the report of the case a full and complete copy of the bill of exceptions. A reversal of the judgment, however, is based upon the action and conduct of the court, and the district attorney and prosecuting officer, and the conduct of the sheriff as well as the examination of the girl indicating that she was compelled to testify under threats and coercion. A discussion of the case is not further indulged as it is a case so nearly within Hamilton v. State, 68 Texas Crim. Rep., 419, it is unnecessary. The facts are similar, and the conduct in connection with this witness analogous to that in the Hamilton case. That case was reversed and for the same reason this judgment is ordered reversed.

The judgment is reversed and the cause remanded.

*Reversed and remanded.*

PRENDERGAST, JUDGE (dissenting).—Appellant, a young man twenty-one years old, was convicted of the rape of Ola Fincher, a girl just over thirteen and one-half years of age. His punishment was assessed at five years in the penitentiary—the lowest prescribed by law.

Appellant's sole complaint was to the action of the court in his endeavor to have the witness Ola Fincher to testify to the "truth, the whole truth and nothing but the truth" as she had sworn to do. No complaint was made of anything which occurred before the jury. All that which was complained of was before the court only, while the jury was retired in the custody of a proper officer. The jury did not hear and were not aware at the time, of anything which occurred with reference to said witness while before the court alone.

His two bills on this matter are very lengthy, more than forty typewritten pages. They contain the stenographer's verbatim report of all that was said and done to, and by, the witness in this examination of her in the absence of the jury. It is out of the question to give them in full in this opinion. The judge qualified each of them before approving them, in a lengthy qualification. The qualification was in accordance with, and borne out by, the record and facts. Appellant accepted the bills as qualified and under all the authorities is bound thereby.

In no instance when he made an objection, or took an exception was any reason or cause assigned for his mere objection or exception. After stating in full in his bills all that was said and done, he says: "To all

of which proceedings so had as above set out, the defendant then and there in open court duly excepted." No reason or ground of exception is in any way stated.

The facts of the case as shown by the record, together with the substance of the bills and the qualification thereof will be given. In connection therewith, the law applicable thereto will be stated.

Each witness before testifying must and does solemnly swear that the testimony he gives in the cause pending before the court "shall be the truth, the whole truth and nothing but the truth, so help me God." (Sec. 988, White's Ann. C. C. P.) This witness took that oath. The trial judge in this instance, as this record unquestionably shows, undertook in a proper way to have her comply with her oath. He did nothing more than that.

This court, through Presiding Judge White, in Cox v. State, 8 Texas Crim. App., 254, said: "True, a judge, technically speaking, may not be a representative of the State in prosecuting parties charged with crime; but he is nevertheless an officer of the State charged with the high and responsible duty of seeing that the law is faithfully administered. . . . Holding the 'scales of justice equally balanced,' and supposed to be far removed from the influences of interest, prejudice, and passion, he is expected to guard with equal jealousy the respective rights both of the State and the accused."

Our Supreme Court in Waters-Pierce Oil Co. v. State, 106 S. W. Rep., 326, held and quoted 8 Am. & Eng. Ency. of Law, 28: "Every regularly constituted court has inherent power to do all things that are reasonably necessary for the administration of justice within the scope of its jurisdiction."

In Holdman v. Mayor, 34 Texas, 668, it is said: "The refusal of a witness to answer a legal and proper question is a decided contempt; and no matter in what respectful terms or deference of manner the refusal is made, he stands out against the authority of the court. . . ."

In 3 Ency of Ev., p. 494, it is said: "A prevarication or an evasive answer on the part of a witness is considered equivalent to the refusal of the witness to testify."

On page 485 it is said: "When before the court a witness may be compelled to answer any lawful question. . . ." And again on page 475 it is said: "The power to compel a witness to answer lawful questions is inherent to all courts of record."

In 1 Thompson on Trials, section 354, it is said: "The manner of examining a witness is largely within the discretion of the court before whom the witness is produced, and that discretion must be governed in a great measure by the knowledge of the character of the witness and from his demeanor during his examination." In section 355 it is said: "A judge presiding upon the trial of the case is more than a mere moderator between contending parties. He is charged with the grave duty of maintaining truth and preventing wrong and to this end

has a large discretion which, if exercised without abuse, will not be error."

In 5 Jones on Ev., section 800, it is said: "Contempt of court involves two ideas—disregard of the power of the court and disregard of its authority. 'Disregard of power, in that lawful orders have not been obeyed; and disregard of authority, in that its jurisdiction to declare the law and ascertain and adjudicate rights of the parties is hindered, prevented or set at naught. Such conduct is an offense against the court as an organ of public justice, and may be rightfully punished on summary conviction.' . . . It is enough if the witness' conduct tends to bring the authority of the law and of the court engaged in the administration of the law into disrespect or disregard. It has never been doubted that a refusal to testify on the part of a witness or to give evidence on relevant questions is contempt. And the matter is not mended by a refusal obviously wilful to give intelligent, connected and reasonable answers to questions fairly calling for the same." Again: "The witness may not trifle with the court by pretending nominally to answer, but in reality to cloak a refusal. Prevarication by a witness has the same effect upon the administration of justice as a refusal to answer. To the same effect it puts the witness in the position of standing out against the authority of the court, and thwarts the court in its efforts and purpose of doing justice between the parties. It is contumacy. It is direct contempt of the authority of the court."

In this instance the witness Ola Fincher was quite an intelligent girl, just past thirteen and one-half years of age and in the seventh grade in the public schools. On the night of July 7th appellant and another young man, Wesley Von Rosenberg, picked up on the streets of Amarillo, when they were going to their homes, said Ola and another young girl about fourteen years old, Irene Tucker, in their automobile, took them out in the country several miles and kept them until just about daylight the next morning, when they took them back to Amarillo, put them in a hotel, where they remained until about 9 o'clock that day, when they went to their homes. Very soon thereafter, the Tucker girl, with her mother, before she could be subpoenaed, was run, or ran, out of this State and then took up their abode in another State. The State could not obtain her as a witness in this trial. Ola and her father and mother were very much opposed to the prosecution of appellant, and she admitted on the stand that she did not want him punished. She and her mother and father were very hostile to the State, and both of said girls and their fathers and mothers were unfriendly to the prosecution and were doing everything within their power to prevent a prosecution.

The next day, after Ola returned to her home and before she had talked the matter over with anyone, and before she had been "fixed" or tampered with by anyone, the district attorney, county attorney and sheriff heard of the matter, and the sheriff took her, it seems with the consent of her parents, to the courthouse in Amarillo before the justice

of the peace and there was had an examining trial, to find out the facts. as to what said young men had done to said two young girls when they had them out all night on the night of July 7th. Ola was duly sworn by the justice of the peace. She testified fully. Her testimony was taken down in writing, and she signed it and swore to it before the justice of the peace.

In this proceeding before the district judge, in the absence of the jury, her written, signed and sworn testimony before the justice of the peace was produced and exhibited to her. She admitted that she had signed and sworn to it. She then read it over herself. It was also then read over to her by the district attorney.

In this sworn testimony she stated her age, residence, the time she had gone to town on the night of July 7th, all she did, the places she went, with whom she was and a good deal of detail at that time unnecessary to state here; and then she told of appellant and Von Rosenberg picking her and Irene up in their automobile and taking them out into the country, telling the road they went, where they stopped, about how long they stayed there, when they returned and all about it. Therein she swore that Von Rosenberg and Irene sat on the front seat. and she and appellant on the back seat in the car. That they went out some miles when the car was stopped. That when they first stopped appellant was asleep with his head in her lap, but she woke him up. She swore: "It was then when Von Rosenberg had intercourse with Irene there on the front seat of the car. Irene was lying down across the front of the seat on her back and Von Rosenberg was lying on top of her with his face towards her face, . . . he was going up and down on her." That they then drove the car to another point about a mile and stopped again by a haystack, and that Von Rosenberg and Irene went to the haystack. She swore: "Before Von Rosenberg and Irene went to the haystack, Buzz (appellant) Venable had his hand on my person up under my dress. They went to the haystack. Buzz (appellant) kept asking me to have intercourse with him and I told him,. no, I was sick. He kept on and pushed me over in the back seat of the car. After he pushed me over he pulled up my dress. He took his pants clear down. After he took his pants down he had intercourse with me. I know what intercourse is. No officer of the court has told me what 'intercourse is.' I know what intercourse means. Intercourse means when a man takes his penis and puts it into the private parts of a woman. I know what you mean when you say private female organs. He took his penis and put it in my private female organ. His male organ penetrated my female organ. After he had penetrated my female organ his body went up and down and I could feel his male organ within my private female organ. I could feel his organ inside of me. He went up and down on me a short time; that is, from one to two minutes, I would think. The get (He then) got off of me. I was in the back seat lying down and he was on top of me, between my legs. It hurt me some when his penis entered my female organ. I suffered

some pain from the act. I told him that it hurt me. The hurt was
the greatest at the opening of my female organ. I told him that it
was hurting me and he got up; however, his male member went clear
on into the inside of my female organ. He then got up. We got up
and walked out to the barbed wire fence. We looked over the barb wire
fence and Von Rosenberg was on top of Irene, she was lying on her
back. I could see her naked white limbs. Von Rosenberg was on top
going up and down. It was just a few feet away. Probably about
twenty feet away. I saw a car coming and I said, 'Come on quick.'
They jumped up and got in the car and we turned around and passed
the car at a rate of about fifty miles per hour." She further testified
where they then went, where they stopped and that the two men got,
a quilt and then they went back out into the country to Cliffside. She·
swore: "Just before we got to Cliffside Buzz (appellant) wanted Irene
to get up in the seat with him and she got back there with Buzz and I
got up in front with Von Rosenberg. We rode that way until we got:
about two miles beyond Cliffside and Von Rosenberg put the quilt down,
on the ground under a shade tree, and the car was about twenty feet,
away. Von Rosenberg said to me to come out there and sit with him.
on the quilt and I did so. Buzz and Irene stayed in the car. They
did not do anything for about fifteen minutes. Irene lay down on her
back and Buzz got on top of her and they were going up and down, that
is, Buzz was going up and down on Irene. He was on Irene about five·
minutes. After they finished Buzz got up and pulled up his pants and.
buttoned them up. I did·see them. There was nothing to obstruct.
my view in seeing them have the act of intercourse." She denied hav-
ing intercourse with Von Rosenberg and swore they did not stay out
there very much longer but went back into Amarillo. That appellant
gave Irene $2 and told them to go to the hotel, which they did. She
further testified that her monthlies came on the Friday morning before.
That she was well on Monday morning and took her cloth off that morn-
ing. That none of her clothes had blood on them. That the cloth was
a white cotton cloth and did not have much blood on it, but at the time
she testified it had been burned. She swore: "All that I have told
here is the truth. I have told it willingly. I have told what has hap-
pened without being scared and not in response to set questions asked..
You have only asked me for the truth."

The bills and·the qualification thereof show further that when the·
State put the witness Ola Fincher on the stand that she testified to.
some of the preliminary facts leading up to where these four parties;
went, what they did and said until they led nearly up to the material.
fact of whether or not appellant had had sexual intercourse with her·
that night, but had not asked her as to that fact. The court says in
his qualification that at this·time "She was answering questions leading
up to the main issues in a way which clearly indicated her leaning
towards the defendant and which she admitted in the trial of the case.
She was very much opposed to the prosecution and admitted on the

stand that she did not want the defendant punished. The atmosphere of the trial at that stage of the trial was the most unusual. The defendant was at that time and at all times until the retirement of the jury, and for the most part after the retirement of the jury, making signs, gestures and nodding his head and he was constantly looking at the witness as if he considered himself possessed of some occult power over her, reminding me of a cat undertaking to charm a bird, and at one time I had to ask the witness why she looked at the defendant before answering." The court further said that the district attorney was asking these preliminary questions which would have been irrelevant and immaterial except for the purpose of showing the jury the kind of witness she was in order to enable them to pass upon her credibility and to test her memory, when he asked her: "Do you remember Mr. Richey, the county attorney, at Clarendon?" She said that she did not and he asked her if she remembered telling the grand jury of Donley County something, which she answered in the affirmative. (The grand jury of Donley preferred the indictment herein.) She was then asked if that was the truth, when counsel for defendant objected because it was improper, irrelevant, immaterial and prejudicial; the court then said: "Mr. Sheriff, I wish you would retire the jury a few minutes." The jury did then retire out of the hearing of the court in charge of an officer. The appellant's attorney then said: "Your honor, we want a bill of exceptions to your honor's retiring the jury." The court: "Why, sure, that is all right, you can have your bill." Nothing further appears in the bill as to why appellant objected to the retiring of the jury. No reason for the objection is given and none is suggested.

The bill and record further show that after the jury retired the district attorney began examining the witness about her said sworn testimony in the examining trial before the justice of the peace. He read the whole of it to her. He asked her questions about her said sworn testimony which showed that she testified that on the morning of July 9th the sheriff went to her residence and took her to the courthouse when she appeared before the justice of the peace and gave that written, signed, sworn testimony. The whole trend of questions to her shows that the State's attorney and the court dealt with her in the most considerate way and gentlest manner, endeavoring, and only endeavoring, to get her to testify to the truth, and only to the truth, whatever it might be. She tried every way she could to avoid testifying to what she had so testified, signed and sworn to. She claimed not to remember some of the statements therein which she had signed and sworn to. The court then admonished her not to try to dodge around in her testimony and this "don't remember" business, and asked her if she had heard that it was an offense against the law to commit perjury. She said she did not know what he meant by that. He then explained it to her and told her that she could be punished for violating this law, and that it was a violation of the law for her not to tell the truth; that all he wanted her to do was to go on and tell the truth whatever

it might be. Then the examination of her by the district attorney proceeded with the same result from her as theretofore. The district attorney then asked her if she knew what the penalty was for swearing a falsehood. She said she did not understand what that meant. The court then read the perjury statute to her and stated the penalty and asked her if she knew there was a woman in jail at Amarillo, convicted and sent to the penitentiary for twenty years. She answered, "No, sir." Appellant's attorney then said: "We desire to take a bill of exception." The court replied: "You understand that you will get a full bill." Another of appellant's attorneys said: "I understand that your honor was going to give us a full bill." The court: "Certainly, if you get any advantage out of this just go to it." Attorney: "Well, we take an exception to that." The court: "Certainly, you have got an exception to everything." No reason or ground is stated why they made these objections at this time. The examination of the witness proceeded for a while and then the district attorney said to her: "Ola, you can either testify to the truth of the transaction or I will be perfectly frank with you, or be indicted for perjury. Now you can just go either route you want to go, now I want to give you a fair show and warning." One of appellant's attorneys then said: "We take a bill to that." And the court replied he would get his bill to everything. No reason is assigned why he said he would "take a bill to that." The examination of the witness proceeded as before. The indictment herein was preferred by the grand jury of Donley County on July 20th. The district attorney then asked her if she did not tell the grand jury of Donley County, after being duly sworn, that her said testimony before the examining court was the truth. (Her sworn testimony taken before the examining court in connection with her then oral testimony, was used before the grand jury.) She answered that she did and that she told them that appellant had had sexual intercourse with her as stated therein, but when then asked if that was not the truth she said, "No, sir." The examination still proceeded along the same lines. When the district attorney failed to get her to testify what he believed was the truth and what her sworn testimony before the justice of the peace showed to be the truth, he announced to the court that he would file a complaint against her. The court thereupon suggested that another one of the attorneys for the State should examine her. And he did so at some length in the same considerate and gentlest manner, with a like result, she then claiming that she did not know what certain words in her said testimony meant. The court thereupon examined her and asked her to point out to him what words in it she did not understand. And her written testimony was then handed to her. She read the first page and stated upon inquiry of the court if she found anything on the first page she did not understand, that she did not. She then read on and she pointed out the word "intercourse" to the judge as one word she did not understand; and then another, "penetrated" and then

another, "penis"; and another, "female organ"; and then she told him she understood all the rest. The examination in this same manner proceeded for some time. She was asked many times her understanding of these words and her answers and manner indicated that she was prevaricating, that she did know what these words meant, each and every one of them. Clearly, when the court and the attorneys could not induce her to swear what they believed was the truth about the matter and what evidently was the truth, which she knew, the district attorney sought to withdraw his announcement of ready and wanted to continue the case, but the court refused to let him do so and said he would keep the court open for a year if necessary. The court then had prepared, and the clerk to enter an order reciting that it appearing to the court that the witness had knowledge of material facts which she had testified to in the absence of the jury but which she refused to testify to in the presence of the jury and persisted in claiming not to remember, whereupon he adjudged her guilty of contempt of the court, and that she was attempting by such conduct to hold the court in contempt and without power and authority to compel truthful answers to fair questions, therefore he ordered that she be committed to the custody of the sheriff until she purged herself of contempt which she could do by giving answers to the questions in a truthful manner and at the time when the court was ready to hear the testimony. She thereupon late that evening was taken in charge by the sheriff and kept with him and his wife all night. The court adjourned until next morning. She was taken in charge by the sheriff; not placed in jail, but taken to his residence, treated in the most gentle manner; she slept in a bed in the same room in which he and his wife slept and he returned her to the court the next morning upon its opening. She was again placed upon the witness stand, still in the absence of the jury, when the district attorney proceeded to further examine her when she began the same tactics as the evening before, and repeatedly when asked questions would give no answer. The court again admonished her and asked her what was the trouble, why she would not talk. She made no answer. The court thereupon ordered the sheriff to take her to jail and told her he would hold the court open until she decided to talk. He then asked her if she did not understand that the court could pronounce the sentence of death, actually taking the life of a person, and asked her if she did not know that. She said, "Yes, sir." He told her that her sitting there obstinately was very much out of the line with the right to say the least of it and asked her if she wanted the jury brought back; and if she would then go ahead and tell, or if she would rather go to jail now, and asked her what she said about it. He then asked her: "What are you looking over there for?" One of appellant's attorneys stated: "I was waiting until your honor got through. I want to take a bill." The court asked the witness: "What do you say about it?" She said: "I would rather tell what I have to tell." And upon inquiry of the court she repeated that. The court again asked her if she wanted the jury

to be brought in and she replied it made no difference to her. The court then instructed the district attorney to question her, and said we will see. One of appellant's attorneys said: "I understand we have a bill to all the court's remarks." The court: "Oh, yes, sir." The attorney: "Especially the threat to send her to the penitentiary and the threat of death." The court: "Sure, that is right, whatever was said (to the witness) you didn't understand me to say that I was threatening to put you to death, did you?" She answered, "Yes, sir." (On her cross-examination by appellant's attorney she swore the court corrected that at the time, and told her "he was not threatening to have me killed if I didn't tell this.") The court then explained to her that he meant no such thing. That what he meant to tell her was that the court was powerful enough to put a person to death—an offender against the law and that it would be a very weak court that could not compel a witness to give testimony. The attorney interrupted to say: "I am sure that she understood—" The court said: "Now, I don't care to hear from you further on this subject. You have got your exception all the way through and you have a record and I don't propose to hear anything further on this subject." And the attorney excepted to the court's "refusal to hear a bill of exception." The district attorney then proceeded to further examine the witness and upon his asking material questions she gave no answers. The court thereupon announced that the witness had not purged herself of contempt. She said she did not want to go to jail. The court: "Go right on to jail." She then protested repeatedly that she did not want to go to jail. The sheriff requested her to "come on, let's go," but she remained seated in the witness seat and refused to go with the sheriff. And she said she had not been treated fair enough. The court asked her in what way she had not been treated fair enough, and she began crying. The court told her when she got through crying she could go ahead and talk. After consuming the whole of the morning with the witness as indicated the court reconvened at 2 o'clock in the evening. The jury was placed in the box and the witness then testified substantially in accordance with her sworn testimony before the examining court.

In further qualification of appellant's bill, in addition to what is stated above, the court stated that this witness answered promptly questions propounded by appellant's attorneys but was neither prompt nor truthful, in his opinion, in answering the questions propounded by the State's counsel.

In one of appellant's bills it is alleged that late the first evening, when the court ordered the sheriff to take charge of the witness and to let the sheriff of Donley County, who was present when she testified in said examining trial and who was then under the rule, talk to the witness. Appellant then sought to have his attorneys present at this conversation but the court refused to permit them to be present. He excepted to the action of the court in refusing to permit his attorneys to be present at the conversation between these two witnesses, but assigned

no reason. He did not object to the witnesses having a conversation, nor to the action of the court in permitting it. The bill in no way shows what the conversation was. The court then further says: "Her attitude was so contemptuous that the court remanded her to the custody of the sheriff, who kept her at his home over night, and under these circumstances and with such influences working the judge of this court felt and still feels that it was proper to protect the court's jurisdiction and that it would not have been protected if the defendant and his counsel had then had the opportunity of discussing the case with her. In my opinion the slightest encouragement which might have been possible from the mere fact that counsel for defendant be accorded the right at that stage of the proceeding to discuss the matter with her would in the opinion of the judge have thwarted the purpose of the law, to compel witnesses to respect their oath and testify truthfully to facts within their knowledge. But before the cross-examination of the witness the court did inform defendant's counsel that it was their privilege now to talk with the witness and they availed themselves of the opportunity; the court taking a recess and giving them the opportunity and the jury not knowing the purpose for which the recess was taken. . . . The jury would have had no reason for knowing what was transpiring in their absence in my opinion, and I am not aware and have not been informed that they did know what was transpiring in their absence, and when they returned into court the judge merely said to the witness Ola Fincher: 'Do you feel well enough or able now to testify?' And she answered that she didn't feel so very good, and the district attorney then began propounding questions to her. Nothing was mentioned in the direct examination by the district attorney relative to what transpired in the absence of the jury and when defendant's counsel began cross-examining her they undertook to and did develop what they considered important to them pertaining to the proceedings had in the absence of the jury. Contempt proceedings against the defendant were initiated after the trial and while the court had no doubt, and so stated to the defendant, of his guilt, yet the defendant broke down in that proceeding and with tears in his eyes said that he did not intend any contempt of court by the signs he was making and did not know he was doing anything in the trial to bring himself in contempt; and he was a young man about twenty-one years of age, so he was discharged for the reason that it was thought best that the court under those circumstances might perhaps be merciful without injury to the defendant or the court's dignity."

After she had completed her testimony before the jury, on her direct examination and before the appellant undertook to cross her, as stated, the court announced to appellant's counsel that they could then interview her privately, which they did. When they placed her back on the stand for cross-examination, they then had her go over before the jury each and every item of what he claimed was improper before the judge

in the absence of the jury and asked her everything about all of those matters. So that in that way the appellant himself reproduced substantially all of the conduct of the court and of the district attorney and prosecuting attorney and everything that they thought would show to the jury her mistreatment and what caused her to ultimately tell the true facts of the case; and then they had her to testify in substance and effect and deny appellant had had sexual intercourse with her on said occasion. The State on redirect examination went over the matter again briefly with her and she said that he did have intercourse with her and that her testimony to that effect was true. This passed back and forth a time or two with the same result. Appellant's attorney asked her: if in finally testifying against appellant as she did it was "because you willingly want to give this jury the truth, or because you are scared." A. "Well, I admit to it, that I am scared." Q. "That is all." A. "I am telling the truth." .

Upon the whole, whether or not her testimony against appellant to the effect that he did have sexual intercourse with her was a question of fact for the jury to pass upon. Taking the whole circumstances, no one could for a moment doubt her testimony when she swore he did have sexual intercourse with her. It is certain that he did, and that her testimony so stating was unquestionably true, and the jury believed her.

The action of the court in dealing with this witness from start to finish demonstrates that the court and the prosecuting attorneys had no other purpose or intention whatever than to induce this girl to testify to the truth and nothing but the truth; that their conduct towards her was most considerate and the manner towards her was no other than to induce her to tell the truth and nothing but the truth. The treatment of her was in no way harsh, overbearing or oppressive.

Neither can there be any question but that this girl was undertaking in every way conceivable, no doubt inspired by appellant himself or through him to testify falsely in his behalf and save him from the just punishment which his rape of her undoubtedly merited. The law and justice and right should not be permitted by the courts to be trampled under as it was attempted to be done by the witness and the appellant in this case. If such conduct by an accused and a witness doing everything possible to shield him could prevail then the power and authority of the court to administer justice, to ascertain and declare the truth and to execute and carry out the law would be a farce and a mockery. It was not tolerated by the courageous judge in this instance and should not have been. What he did was right. What he did was within his undoubted authority and what he ought to have done.

The only other complaint appellant has is to the refusal of a special charge which he requested. The court specially stated in his qualification to the appellant's bill what the appellant explained to him at the time and that he modified his charge to meet the exact question for

which the charge was asked and thereupon refused his.   As explained, the bill presents no error.

The judgment should be affirmed, not reversed.   I dissent.